10 Cal.Rptr. 242]

[Civ. No. 24790. Second Dist., Div. Two. Jan. 3, 1961.]

FIFIELD MANOR (a Nonprofit Corporation), Appellant, v. COUNTY OF LOS ANGELES et al., Respondents.

[Civ. No. 24789. Second Dist., Div. Two. Jan. 3, 1961.]

FIFIELD MANOR WILSHIRE (a Nonprofit Corporation), Appellant, v. COUNTY OF LOS ANGELES et al., Respondents.

[Civ. No. 24791. Second Dist., Div. Two. Jan. 3, 1961.]

FIFIELD MANOR PASADENA (a Nonprofit Corporation), Appellant, v. COUNTY OF LOS ANGELES et al., Respondents.

2

Overton, Lyman & Prince, George W. Prince, Holbrook, Tarr & O'Neill, W. Sumner Holbrook, Jr., and Francis H. O'Neill for Appellants.

Harry B. Seelig, Anderson, Adams & Bacon, Chester B. Anderson, John F. Fay, Hugh C. Friedman, Roland Maxwell, George R. Schmidt, Samuel Steelman, Vaughn & Morrow, Dion G. Morrow, C. P. Von Herzen, Gibson, Dunn & Crutcher, Max Eddy Utt, Norman B. Barker, Hammack & Pugh, Dan S. Hammack, Jr., Schofield, Hanson, Bridgett, Marcus & Jenkins, Thomas M. Jenkins, Price, Postel & Parma, Robert M. Jones, Musich, Peeler & Garrett and James E. Ludlam as Amici Curiae on behalf of Appellants

Harold W. Kennedy, County Counsel, and John D. Cahill, Deputy County Counsel, for Respondents.

ASHBURN, J.—Plaintiffs appeal from judgments in nine consolidated actions denying them a welfare exemption from property taxation under section 1c of article XIII of the Constitution and section 214, Revenue and Taxation Code.

The former, adopted in 1944, as amended in 1954, provides: "In addition to such exemptions as are now provided in this Constitution, the Legislature may exempt from taxation all or any portion of property used exclusively for religious, hospital or charitable purposes and owned by community chests, funds, foundations or corporations organized and operated for

religious, hospital or charitable purposes, not conducted for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual. As used in this section, 'property used exclusively for religious, hospital or charitable purposes' shall include a building and its equipment in the course of construction on or after the first Monday of March, 1954. . . .''

Pursuant to the authority thus granted the legislature enacted sections 214 and 254.5, Revenue and Taxation Code, in 1945. Section 214 (as amended in 1953 and 1955) grants the ''welfare exemption'' to ''Property used exclusively for religious, hospital, scientific, or charitable purposes owned and operated by . . . corporations organized and operated for . . . charitable purposes'' if certain specified conditions are present: (1) The owner is not organized or operated for profit; (2) no part of net earnings inures to the benefit of any private individual; (3) property is used for the actual operation of the exempt activity; (4) property not used or operated so as to benefit any person through distribution of profits, payment of excessive charges or compensations, or the more advantageous pursuit of business or profession; (5) property not used for lodge or social club purposes except where such use is clearly incidental to primary charitable purpose; (6) property irrevocably dedicated to charitable purposes and upon liquidation or abandonment of the owner will not inure to benefit of any private person except a corporation or other fund or foundation organized and operated for charitable purposes; (7) relates only to property used for scientific purposes.

Section 254.5 provides that the exemption must be claimed through affidavits showing *inter alia* financial condition of owner, duplicate of which affidavit shall be forwarded to the Board of Equalization, which shall review the application, considering among other matters whether (a) services and expenses of owner or operator (including salaries) are excessive, based upon like services and salaries in comparable public institutions; (b) the operations, directly or indirectly, materially enhance the private gain of any individual; (c) any capital investment for expansion of physical plant is justified by contemplated return thereon, and required to serve the interests of the community. The board thereupon forwards to the assessor its finding and he is required to consider same in determining the claim to exemption.

Each of the plaintiffs owns and conducts a home for the aged. That of Fifield Manor, formerly the Chateau Elysee Apartments, is situated on Franklin Avenue in Hollywood. Fifield Manor Wilshire owns and operates an apartment house on Wilshire Boulevard in Los Angeles, formerly known as Arcady Apartment Hotel. Fifield Manor Pasadena acquired and operates a property formerly known as Constance Hotel, on Colorado Boulevard in Pasadena. These plaintiffs were organized as nonprofit charitable corporations in 1951, 1953 and 1956, respectively. Fifield Manor (in Hollywood) and Fifield Manor Wilshire sued to recover taxes paid under protest for the years 1955, 1956, 1957 and the first half of 1958. The Fifield Manor Pasadena suit relates only to the tax for the first half of 1958.

The trial judge conceded that ''[t]he three projects now before the court were undoubtedly undertaken with the most dedicated and beneficent purpose.''

These institutions sprang from the benevolent aspirations of Mrs. Helen R. Fifield, wife of the Pastor of First Congregational Church of Los Angeles. Under her leadership members and friends of the church, mainly persons who desired to live in a home for the aged such as Mrs. Fifield had envisioned, contributed enough money to the charitable corporation formed for the purpose, Fifield Manor, to enable it to buy Chateau Elysee Apartments and to convert it into a home for the aged. In the earlier years entrants to the home made contributions based upon a schedule which aimed at paying off the debt upon the property (some $350,000) prorated according to the size and desirability of their respective accommodations. Life-care contracts were made which provided for occupancy of specific quarters, meals, maid service, medical, hospital and mental care when needed; the entrant paid a lump sum predicated upon an index of cost and the actuarial expectancy of one of his or her age. This lump-sum payment, though based upon cost, was designedly fixed at a sum less than actual cost—''as low as possible without creating a deficit so large that it could not be met by gifts and contributions which could be expected.'' No worthy person was to be denied or was in fact denied admission because of inability to make payment of all or part of an admission fee; the entrance fees of such persons were raised by seeking donations from members and friends of the First Congregational Church and of the Fifield Homes; in some instances entrance fees were waived.

In fixing the life-care contract payment the homes used the McClintock Expectancy Table, which proved to be so outdated that the State Welfare Commission since January 1, 1958, has required the use, with respect to new members, of the so-called "State Table" based substantially upon the Huggins Expectancy Table, which involved an increase of approximately 50 per cent in the expectancy of aged persons. For example, a female aged 65 had a probable continued life of 11.26 years under the McClintock table, while the state table gave her 17.94 years; at age 75 the increase was from 7.32 years to 10.82 years; at 85, from 4.19 years to 5.58 years. Life-care contracts which had been made upon the basis of the McClintock table were not affected by this ruling. Fifield Manor Wilshire and Fifield Manor Pasadena followed this same pattern which had been set by Fifield Manor (Hollywood). By the time of trial in March 1959, an actuarial deficit of $4,388,764.52 had accumulated upon the three homes. The life-care contracts had resulted in an average loss of $68.48 per member per month at Hollywood, $47.23 at Wilshire, and $68.78 at Pasadena; the total as of January 1, 1959, was $827,509.13. Like judges who are relieved of financial worries through assured salaries and pensions, residents of homes for the aged have a strong tendency to survive beyond the limit of the statistical expectancy. This $827,509.13 is a total of actual operating losses, not an actuarial one. They have been covered by donations from charitable-minded persons such as members of the Congregational Church. By the end of 1957 all indebtedness upon all the homes (except $36,000 on Pasadena) had been cleared through such donations and contributions by "first generation" residents of the homes, and so new and lower schedules of admission were put into effect about July 1, 1958—this notwithstanding the operating loss theretofore incurred. These charges, according to the testimony of Mrs. Gladys C. Johns, Supervisor of Aged Institutions, Los Angeles area of State Department of Social Welfare, "in general . . . are a little lower than most other homes." On cross-examination: "Q. Now, would you say for the year 1955, on the admission fees charged at Hollywood and Wilshire, they were lower or larger or about the same as those found in the other institutions? A. I would say that they were generally about the same. . . . Might possibly have been a little lower. I think at the present time they are quite a little lower." Later, due to pressure of inflation, the life-care index was increased, applicable only to new contracts be-

cause existing ones were not subject to such alteration. But the result as of the time of trial was operation at Hollywood at a loss of $45.26 per month per member, at Wilshire $47.69 a month, and at Pasadena $38.97.

Mr. Weining who was at all times manager of the three homes testified: ''Q. . . . Now, it has been said, at least in argument in this case, that the element of charity in an institution of this sort is not the giving of something below cost . . . [but] the care of the people who need that at that time of life. . . . I would like to have a picture, if I can, of just what this Home does. A. Of course, I would say that all of them needed the Home and such care, whether ours or another's care. I will go a step further and say that in my opinion there are probably 50,000 people in Los Angeles County alone in this bracket, in this price bracket we will say. In this care bracket we have we know hundreds who need to be in these Homes, or should be in such Homes, but because of the various stigmas attached to Homes for the aged or something, they do not go in such Homes. The answer to your question is that all of them need such care.'' Again: '' [M]any of these people are incipient charges on some form of government agency. . . . I mean by that, . . . in reading a great deal and studying of the field, I have been able to ascertain that approximately 40% of all females over 60 prior to their being —are a charitable charge of either some direct charity or some governmental agency, which of course effects the tax payer's pocketbook . . . and there are a number of people at each of our Homes that, due to their mental incompetence or inability to cope with business affairs that I know would have lost all their worldly possessions and probably would have become charges of some governmental agency or some charitable organization. In Fifield Wilshire I would figure that there are 24 such people, 23 females and one male . . . Q. . . . So we tie that in, that is 24 out of a total of residents of 176? A. That's right.''

It is a generally recognized fact that modern miracle drugs and intensive study of geriatrics have lengthened the lives of our people, especially those past 60, to a remarkable extent in recent years. The Congress in an act passed September 2, 1958, entitled ''White House Conference on Aging Act'' (1 U.S. Code Congressional and Administrative News, p. 2101) declares that: '' (1) The number of persons forty-five years of age and older in our population has increased from approxi-

mately thirteen and one-half million in 1900 to forty-nine and one-half million in 1957, and the number sixty-five years of age and over from approximately three million in 1900 to almost fifteen million at the present time, and is expected to reach twenty-one million by 1975." Page 2102: "(5) [T]he lack of suitable facilities and opportunities in which middle-aged persons can learn how to prepare for the later years of life, learn new vocational skills, and develop and pursue avocational and recreational interests is driving many of our older persons into retirement shock, premature physical and mental deterioration, and loneliness and isolation and is filling up our mental institutions and general hospitals and causing an unnecessary drain on our health manpower. . . .

"(7) [W]e may expect average length of life and the number of older people to increase still further, we must proceed with all possible speed to correct these conditions and to create a social, economic, and health climate which will permit our middle-aged and older people to continue to lead proud and independent lives which will restore and rehabilitate many of them to useful and dignified positions among their neighbors; which will enhance the vigor and vitality of the communities and of our total economy; and which will prevent further aggravation of their problems with resulting increased social, financial, and medical burdens."

The First Congregational Church group previsioned this rapidly mounting problem when it founded Fifield Manor in Hollywood. Mr. Noon, President of each manor, testified: "Perhaps I should go back to the original discussion of the plan. It was pointed out by various people who talked about the idea in the beginning that provision is made more completely for people of law incomes and those of high incomes, wealth, do not need any particular provision but that a big group in the middle, self-employed people in the main, teachers and others who, by thrift, accummulate some money in the course of a lifetime but who are apt as a result of a catastrophe or mismanagement, particularly when people become senile, to lose that money and to be left destitute or charges on some form of governmental agency. It is that particular group to whom the efforts of the Manors are directed." That this class of people have been the main beneficiaries of these efforts appears from paragraphs II and III of the pretrial stipulation concerning the Hollywood Manor. The average age of members in 1955, 1956, 1958, was 82 years, and in 1957, 82½ years. Of the 90 residents in 1958, 11 were teachers, 3 were doctors, 2

nurses and 46 housewives. In 1958 there were in the three homes having a total residency of 416, 110 teachers, 13 doctors and dentists, 47 formerly engaged in miscellaneous occupations such as manufacturers' representative, contractor, builder, hotel operator, merchant, investor, real estate, actors and musicians, business employees such as credit manager, accountant, cashier, and 135 housewives.

The principal evidence in the case was a pretrial stipulation made by counsel as to each home. It covered every phase of sections 214 and 254.5, Revenue and Taxation Code, and established full compliance therewith. Specifically it says: "XII. It is stipulated that plaintiff herein, as to each of the several consolidated cases, has taken all necessary administrative steps to entitle it to judgment herein, if otherwise proper. XIII. That plaintiff is not organized or operated for profit and that no part of its net earnings inures to the benefit of any private shareholder or individual. XIV. That the property is used for the actual operation of the claimed exempt activity (except for certain excluded property upon which no claim of exemption is made and which is used for commercial activities which are not a claim made by plaintiff herein.) XV. That the property is not used or operated by the owner or by any other person so as to benefit any officer, trustee, director, shareholder, member, employee, contributor or bondholder of the owner or operator or any other person, through the distribution of profits, payment of excessive charges or compensations or the more advantageous pursuit of their business or profession. That the property is not used by the owner or members thereof for fraternal or lodge purposes, or for social club purposes. That the operations of the owner or operators do not either directly or indirectly materially enhance the private gain of any individual or individuals. That all salaries paid to the employees of the Home are, and at all times mentioned herein have been, reasonable, and are at or below the ordinary going rate for services of such character. The payments for goods and services furnished said Home are, and have at all times mentioned herein been, at ordinary market prices for goods and services of such character. XVI. That all properties of plaintiff corporation are irrevocably dedicated to charitable purposes, and upon liquidation or abandonment of the Home will not inure to the benefit of any private person but shall be irrevocably dedicated to charitable purposes and shall be transferred to such other non-profit charitable corporation as

may be determined by the Board of Directors. XVII. That plaintiff's capital investment in such Home is justified by the contemplated use thereof, *and is required to serve the interests of the community.*'' (Emphasis added.) (The findings incorporate most of these quoted portions of the stipulation but omit the phrase ''and is required to serve the interests of the community.'') The stipulation further says: ''IT IS FURTHER STIPULATED by and between the parties that the only legal issues remaining between the parties hereto are as follows: I. Is the standard of care provided for aged residents of plaintiff's Home for the aged above that contemplated to fall within the provisions contained in Article XIII, Section 1(c) of the Constitution of the State of California, and Sections 214 and 254.5 of the Revenue and Taxation Code?'' Then follow three paragraphs relating to appellants' claim of discriminatory administration of the law, a claim which we deem it unnecessary to discuss in view of the conclusion we have reached upon the main issue. The stipulation concludes as follows: ''That other than hereinabove set forth, no issues remain as between the parties.''

There was no evidence in the case other than this stipulation, witnesses called and exhibits introduced by plaintiffs, and a single exhibit offered by defendants, namely, a copy of the membership agreement used by Fifield Manor. As will appear herein there was no room for conflicting inferences or the claim of a substantial conflict in the evidence.

Both the Constitution and section 214 provide for the exemption in favor of any institution that is actually charitable. The introductory paragraph of section 214 says: ''Property used exclusively for religious, hospital, scientific, or charitable purposes owned and operated by community chests, funds, foundations or corporations organized and operated for religious, hospital, scientific, or charitable purposes is exempt from taxation if. . . .'' The conditions which follow the quoted language, read in conjunction with section 254.5, seem to be intended as a legislative enumeration of elements which in their totality constitute a charity, but the statute does not expressly declare this and we apprehend that it leaves open for canvassing the question of whether any applicant for the exemption fails to qualify because of some feature of its organization or operation which is not mentioned in the statute. The parties by their pretrial stipulation so construed it and the trial was conducted on that basis. The single issue: ''Is the standard of care provided for aged residents of plaintiff's

Home for the aged above that contemplated to fall within the provisions'' of the law?

Respondents' counsel say in their brief: ''Respondents have never contended that appellants have not met all the requirements of a 'charitable' institution. We submit, however, that appellants have not met three of the four prerequisities of a 'charitable' institution, prerequisities established by the Supreme Court in the Fredericka Home case, *supra*.'' The argument is that the assumed standard of care has been exceeded through the fact that these are ''luxury'' apartment homes whose admission and care fees are not within reach of middle-class persons of moderate means. To establish that this removes appellants' homes from the charitable class, counsel rely almost exclusively upon certain language of *Fredericka Home for the Aged* v. *County of San Diego*, 35 Cal.2d 789 [221 P.2d 68], which will be discussed presently.

The courts have long recognized and declared that charity is not limited to giving alms, is not confined to relief of the poor, may extend to the rich in areas where they are not able to care for themselves, and extends to those social objectives which promote the general welfare and would be served by the government in the absence of philanthropic enterprises such as homes for the aged. Historically, and well-nigh unanimously, the courts have found homes for the aged to be charitable institutions where conducted at cost or less. They have also recognized that man, especially the old, does not live by bread alone; that though he be able to pay for all material wants he nevertheless may be dependent upon his fellow man or the government to protect him from the haunting fear of loss of all his property with resultant poverty, fear of illness or other physical disability overtaking him with no one near to help, fear of the loneliness arising from absence of social contacts, fear of any of the tragedies of old age where there is no one standing by to help.

█ *Estate of Henderson*, 17 Cal.2d 853, 857 [112 P.2d 605]: ''A bequest is charitable if: (1) It is made for a charitable purpose; its aims and accomplishments are of religious, educational, political or general social interest to mankind. . . . Since the enactment of the Statute of Charitable Uses during the reign of Elizabeth, aid to the aged and infirm has been recognized as charitable. (See cases cited in 5 Cal.Jur. 24.)

█ Relief of poverty is not a condition of charitable assistance. If the benefit conferred has a sufficiently widespread

social value, a charitable purpose exists. . . . ■ ■ It is a matter of common knowledge that aged people require care and attention apart from financial assistance, and the supply of this care and attention is as much a charitable and benevolent purpose as the relief of their financial wants. Every civilized community must provide facilities, either public or private, for the care of old people regardless of financial condition, and a bequest to such an institution to further its purposes is of enough social value to be designated as charitable.''

■ Following this line of thought the Fredericka opinion says, at page 792: ''The concept of charity is not confined to the relief of the needy and destitute, for 'aged people require care and attention apart from financial assistance, and the supply of this care and attention is as much a charitable and benevolent purpose as the relief of their financial wants.' (*Estate of Henderson,* 17 Cal.2d 853, 857 [112 P.2d 605].) So the charge of fees by such an institution as a home for the aged will not necessarily prevent its classification as charitable if such sums 'go to pay the expenses of operation and not to the profit of the founders or shareholders,' for all persons may 'under certain conditions be proper objects of charity.' [Citations.] In short, as the word 'charity' is commonly understood in modern usage, it does not refer only to aid to the poor and destitute and exclude all humanitarian activities, though rendered at cost or less, which are maintained to care for the physical and mental well-being of the recipients, and which make it less likely that such recipients will become burdens on society.''

■ *Lundberg* v. *County of Alameda,* 46 Cal.2d 644, 649 [298 P.2d 1] : ''The term charity has been defined in a number of California cases as 'a gift to be applied consistently with existing laws, for the benefit of an indefinite number of persons—either by bringing their hearts under the influence of education, or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government.' '' At page 650: ''The argument made by plaintiff that the word charitable should be narrowly construed in favor of taxability has been rejected by this court in two recent cases involving section 1c of article XIII. (*Young Men's Christian Assn.* v. *County of Los Angeles,* 35 Cal.2d 760 [221 P.2d 47] ; *Fredericka Home for Aged* v. *County of San Diego,* 35 Cal.2d

789 [221 P.2d 68].) . . . We refused to follow a contrary holding in another jurisdiction, noting that one of the factors leading to that decision was a 'concept of charity as confined solely to the relief of the needy and destitute . . . rather than comprehending as well activities which are humanitarian in nature and rendered for the general improvement and betterment of mankind, though the recipients of such benefits may be able to pay at least in part therefor. . . .' (35 Cal.2d at p. 768.)''

Returning to the Fredericka opinion, *supra,* 35 Cal.2d 789, that was an action to recover taxes paid under protest and the county relied upon ''plaintiff's 'manner of operation' as determinative of its ineligibility for the tax benefit applicable to a 'charitable institution' within the meaning of the welfare exemption law.'' (P. 791.) The opinion states that an applicant was required to pay a fixed fee for maintenance, the minimum being $5,500 and the average $6,264.04. Over 25 per cent of the gross income came from sources other than residents of the home. Rates were set with the objective that all amounts received from inmates together with income from all other sources would equal expenses; but ordinary funds were always inadequate and the deficits were met by outsiders. No free services were rendered to the poor. The lower court found that the inmates of the home did not pay the full cost of their support and maintenance and that the institution was a charitable one. At page 793 the Supreme Court defined the controlling consideration which determines the claim of status of charitable institutions: ''Defendant's challenge of plaintiff's denomination as a charitable institution and the use of its property for charitable purposes stems primarily from the fact that plaintiff does not extend free services to the poor, but the welfare exemption law as above quoted makes no such requirement as a qualifying factor for the tax exemption, and if such condition were intended, appropriate language to that effect could readily have been adopted. Rather, the welfare exemption law as here involved appears to rest on a concept of charity in its ordinary sense. Consistent with such interpretation, the *controlling consideration* in determining whether an institution such as plaintiff should be classified as a charitable one is not whether a few or all of the recipients of its benefits may make reasonable contributions toward defraying the cost of such benefits, but *whether such contributions as are made do not exceed what is required for the maintenance of the institution* at a reasonable standard

and are devoted to the purposes for which the institution was founded, which purposes, in the absence of the required contributions, would clearly be deemed to be charitable. If such is the situation, then the institution is no less a charity because of the receipt of such contributions, and within such concept plaintiff properly claims a tax-exempt status under the welfare exemption law.'' (Emphasis added.) At page 794: ''While it is true that each applicant for admission to the home is required to pay an entry fee in return for his care, it is also true that plaintiff contributes a substantial proportion of the annual cash expenditures, as well as the use of its properties for such care. Under these circumstances, the mere payment of such fees by the inmates does not militate against plaintiff's status as a charitable organization. . . .

''As was pertinently said in *Estate of Henderson, supra,* 17 Cal.2d 853, at page 857: 'Since the enactment of the Statute of Charitable Uses during the reign of Elizabeth, aid to the aged and infirm has been recognized as charitable.' Here the record shows that plaintiff is ministering to its elderly residents at a charge which, although appreciable, is within the reach of persons in modest circumstances and is no greater than that which is required to augment the substantial amount which plaintiff is able to contribute to the accomplishment of its purposes. There can be no doubt that arrangements for such life care contracts fill a social purpose as well as a need of the applicants for admission. Approaching those years when the physical and mental faculties normally decline over an indefinite period of time and being faced with the prospect of expending increased but indeterminable amounts for care during that period, the applicants, by means of such life care contracts, avoid the need of living in penury occasioned by the haunting fear that they will exhaust their meager resources and become public charges.''

Then follows the language which counsel for respondents stress as prescribing prerequisites to a charity additional to those stated in section 214, Revenue and Taxation Code: ''Accordingly, it is our conclusion that where, as here, the payments made by the elderly residents are within the reach of persons of limited means, where such payments are not commensurate with the benefits derived, where there is no element of private gain, and where all the income of the institution—including that received from residents and the substantial portion received from gifts and other sources—is devoted exclusively to affording a reasonable standard of care

to such elderly persons for the balance of their lives, the concept of charity in its ordinary sense, as well as under a strict but reasonable construction of the welfare exemption law, is met. Such determination of plaintiff's status as a charitable institution is in accord with the general trend of authority in cases determining the character of institutions for tax exemption as well as for other purposes.'' (P. 795.)

 From this respondents deduce the conclusion that there can be no charity unless the payments made by residents of a home are within the reach of persons of limited means or where there has been afforded to the residents something more than "a reasonable standard of care." We do not so construe the opinion. This passage does not purport to lay down prerequisites to charitable status; it merely summarizes the facts and holds they do fulfill the requirements for a charitable institution. It does not declare other factual combinations to be *per se* noncharitable.

 However, if it were to be assumed that only those homes are charitable which are accessible to persons of limited means, the evidence does not warrant the lower court's finding that "[t]he services furnished and the charges exacted by plaintiff for admission to its apartment hotel are not within the reach of persons of limited means, or of persons in modest circumstances.'' In the first place the Supreme Court recognized in Fredericka, *supra,* that a minimum admission fee of $5,500, or an average of $6,264.04,[1] was not too high where the operations resulted in a deficit. Counsel tells us (what everyone knows) that since that time, 1944, the purchasing power of the dollar has been diminished 40 per cent or more.

Rev. Dr. Gruber, who is executive director of Southern California Presbyterian Homes for the Aged, also president of Association of Homes for Aged in Southern California, and otherwise eminently qualified, made a survey of homes for aged in the Southern California area and testified, largely by way of affidavit upon which he was cross-examined. Comparing the Fifield Homes with Fredericka, *supra,* he said: "Admission fees [of Fredericka] begin at $500.00 for single room accommodations and range up to $13,000.00 (double occupancy), varying with size and location of quarters chosen. Estimated average admission fee is $5,000.00. This compares

---

[1]Appellants' opening brief asserts that the record in the Fredericka case shows that the $5,500 (or average of $6,264.04) was an admission fee to which was added a life-care charge, making the total ''entrance fee'' some $21,000.

with an average admission fee at Fifield Pasadena of $1,978.00, $6,330.00 at Fifield Wilshire, and $7,958.00 at Fifield Manor. It should be noted that the maximum of $13,000.00 at Fredericka for a double occupancy is to be contrasted with a maximum admission fee for a double occupancy at Fifield Pasadena of $4,125.00, or substantially one-third.'' Mrs. Johns testified, as above stated, that Fifield charges are a little lower than most other homes and that means tax-exempted homes, for practically all of them in the southern area had been allowed the exemption.[2]

Counsel for respondent seize upon certain overall average fees received by Fifield Manors as evidence that their charges are beyond the means of one in modest circumstances. But it should be noted that a charge for an apartment of several rooms is to be evaluated as such and does not afford sound basis for comparison with the cost of a single room. Since July 1958, true average admission fees per person per room have been $7,968 at Hollywood, $6,326 at Wilshire, and $1,978 at Pasadena, not the sums of $25,916, $24,449.65, and $17,782, set forth in respondents' brief;[3] respondents' figures

---

[2] Counsel for Amici Curiae tell us, without contradiction from respondents, that the following homes for the aged had been granted the welfare exemption but that it has been denied in 1960 to most of them (24 in all) on the strength of the *nisi prius* decision in the cases now before us, viz.:

Jewish Welfare Federation in Alameda County; Hebrew Home for Aged Disabled in San Francisco; Southern California Presbyterian Homes in Los Angeles; Southern California Presbyterian Homes at White Sands in San Diego County; Northern California Presbyterian Homes, Inc., in San Francisco; Pacific Homes (Kingsley Manor) in Los Angeles; Pacific Homes (Claremont Manor) in Los Angeles County; Pacific Homes (Casa Manana) in San Diego County; Pacific Homes (La Jolla Sanatarium), Pacific Homes (La Jolla Hospital), Methodist Church (Fredericka), the last three being in San Diego County; Evangelical Lutheran Good Samaritan Society in Riverside County; Lutheran Development Society in Sacramento County; Lutheran Services of San Diego County; Marycrest Manor in Los Angeles County; San Franciscan Missionary Sisters Immaculate Conception in Orange County; Christian Home for the Aged in Los Angeles County; Pathway Haven, Inc. and Word of Life Ministry in Los Angeles County; Slovene Rest Home Association in San Bernardino County; San Francisco Ladies' Protection and Relief Society in San Francisco; University Mound Old Ladies' Home in San Francisco; Samarkand in Santa Barbara County; Bureau of Homes, National Retired Teachers' Association, in Ventura County.

[3] Counsel for Presbytery of Los Angeles in their amici curiae brief pertinently observe:

''If a substantial portion of the fees, the entrance fee, pays for the physical facilities, facilities which will be used by subsequent generations of residents, the charitable objectives are served. Under such circumstances, the payments are in no sense commensurate with the benefits received, since a substantial portion of the fees will ultimately inure to the benefit of future generations of deserving residents.''

include the years 1951 to 1957, during which contributions were made by entrants of higher amounts than those prevailing since July 1958. The true average admission fees of $7,968, $6,326 and $1,978 at the Fifield Homes compare with Dr. Gruber's estimated average of fees charged at tax-exempt homes as follows: Kingsley Manor (Los Angeles) $2,500; Claremont Manor (Los Angeles County) $8,000; Casa Manana (San Diego) $10,000; White Sands (San Diego) $12,900; Fredericka (San Diego) $5,000. The evidence does not justify the inference that Fifield charges are beyond the reach of persons of moderate means, nor was that true of the contributions made through the years 1951 to 1957. But this discussion pursues a false clue. Charity may extend to the rich as well as the poor.

*Dingwell* v. *Seymour,* 91 Cal.App. 483, 498 [267 P. 327]: "Also the insistence of respondent that a trust without providing for the poor is not and cannot be a charity must go unrewarded, for both the law and reason are against the contention. (*People* v. *Cogswell,* 113 Cal. 129 [35 L.R.A. 269, 45 P. 270].) Any person, the rich as well as the poor, may fall sick or be injured or wounded and become a fit subject for charity. (St. Luke, chapter 10, verses 30-37.) A trust may be and often is charitable in its nature, uses, and purposes without giving alms to the poor. It is true that poverty is a condition which, even when brought about by indolence and waste of life's opportunities, arrests the attention and commands the consideration of charity. Yet perhaps more worthy and deserving members of society than the ne'er-do-well poor may under certain conditions be proper objects of charity. A gift to establish and maintain a public institution where the misery and unhappiness of any person of high or low degree, rich or poor, may be considered and sanely dealt with would come within the purview of the definition of a public charity. And yet the dollar may not and would not be the sesame to open the door of such an institution."

The test is not found in the question of what financial ability does the recipient possess, but what are his needs, alleviation of which constitutes a worthy social value. We apprehend that the financial test becomes pertinent only when the occupants of an old age home pay more than the cost to the home of what it furnishes them. This view is expressed in the "controlling consideration" above quoted from the Fredericka opinion—"whether such contributions as are made do not

exceed what is required for the maintenance of the institution at a reasonable standard.'' (P. 793.)

*Estate of Henderson, supra,* 17 Cal.2d 853, 858: ''But even if each inmate were required to pay in full for his care, a bequest to the institution may still be charitable. A gift or trust to support an institution beneficial to the community is charitable even though the inmates must pay fees or contribute to the expense of maintaining the institution so long as the income thus derived is used only to maintain the institution or for some other charitable purpose. . . . The support of the Home by annual assessments on members of the Order of the Eastern Star likewise does not destroy the charitable nature of the bequest.''

*Young Men's Christian Assn.* v. *County of Los Angeles,* 35 Cal.2d 760, 771 [221 P.2d 47] : ''Both the constitutional provision and the statute contemplate that the exempt institution may have income and even 'net earnings' without losing the benefit of its exemption, provided such earnings are derived from the normal pursuit of its exempt purposes and provided further that all other conditions, enumerated in section 214 of the Revenue and Taxation Code, are met.''

In *Pacific Home* v. *County of Los Angeles,* 41 Cal.2d 844 [264 P.2d 539], a judgment denying the welfare exemption was reversed. It appeared that admission to the home was upon a single-fee life-care contract, with the rate ''fixed with the intent that plaintiff will 'break even' on the operation.'' (P. 848.) The operation was actually conducted at a loss. Though such was not the primary question the decision necessarily held that the objective of operating at cost upon fees paid by residents did not destroy the essential charitable purpose of the home.

*Scripps etc. Hospital* v. *California Emp. Com.,* 24 Cal.2d 669 [151 P.2d 109, 155 A.L.R. 360], dealt with the right to a charitable exemption from payments under the California Unemployment Insurance Act (p. 671). At page 675 the court said: ''It has generally been held that the fact that fees are charged by such an institution as a hospital is not controlling if these go to pay the expenses of operation and not to the profit of the founders or shareholders. It is also usually held that it is immaterial that such an institution is supported in part by full-pay or part-pay patients, and that it is the use to which any profit or income is devoted which is controlling. These general principles have been recognized in this state.''

It also quoted that portion of *Dingwell* v. *Seymour, supra,* 91 Cal.App. 483, which we have above set forth.

*St. Francis Memorial Hospital* v. *City & County of San Francisco,* 137 Cal.App.2d 321, 327 [290 P.2d 275] : "Any institution organized in whole or in part for a charitable purpose must obtain money from some source with which to defray the costs of carrying on its charity function. That source might be public subscriptions, private donations, endowment funds invested in revenue producing properties whether the revenue comes as interest, dividends, rentals, net returns of a business enterprise, or revenue in some other form, or a combination of several varied types of income. The purposeful pursuit of such income, devoting it, when received, to the financing of the charitable function to which dedicated, does not, we think, make the institution any the less a hospital or charitable institution, despite defendant's urge to the contrary."[4]

*Sutter Hospital* v. *City of Sacramento,* 39 Cal.2d 33 [244 P.2d 390], presented the question of whether the hospital had been properly denied the welfare exemption upon the ground that it did not comply with subdivision (3) of section 214, Revenue and Taxation Code, namely, that "the property [be] not used or operated . . . for profit regardless of the purposes to which the profit is devoted." In the opinion affirming the judgment the court said, at page 37 : "In relation to tax laws, the phrase 'conducted for profit,' which appears to be the equivalent of 'operated for profit,' has presented some difficulty but has been generally held to convey the meaning of operated or conducted for the *purpose* of making a profit. [Citations.] Accordingly, the test indicated by such phrases, as so construed, is not necessarily whether there is or may be a profit but whether the claimant is operated or conducted for the purpose of making a profit; that is, whether the charges are fixed with the intention of yielding a surplus over and

---

[4]In amending section 214, Revenue and Taxation Code, in 1953 the Legislature said:

"It has never been the intention of the Legislature that the property of nonprofit religious, hospital or charitable organizations otherwise qualifying for the welfare exemption should be denied exemption if the income from the actual operation of the property for the exempt activity be devoted to the purposes of debt retirement, expansion of plant and facilities or reserve for operating contingencies, it having been the intent of the Legislature in adopting subsection (3) of Section 214 to deny exemption to property not used for exempt purposes even though the income from the property was used to support an exempt activity." (Stats. 1953, Ch. 730, § 4, p. 1996.)

above operating expenses.'' At page 40: ''Here the determinative factor is the operation of plaintiff's property for the admitted purpose of producing a profit in the sense that the operation was one deliberately designed to produce income in excess of all operating costs.''

*Congregational Sunday School & P. Soc.* v. *Board of Review,* 290 Ill. 108 [125 N.E. 7, 10]: ''Charity, in the legal sense, is not confined to mere almsgiving or the relief of poverty and distress, but has a wider signification, which embraces the improvement and promotion of the happiness of man. A charity is a gift to the general public use which extends to the rich as well as to the poor. The test of a charity and the test of a charitable organization are in law the same. The principal and distinctive features of a charitable organization are that it has no capital stock and no provision for making dividends or profits, but derives its funds mainly from public and private charity, and holds them in trust for the objects and purposes expressed in its charter. In other words, the test whether an enterprise is charitable is whether it exists to carry out a purpose recognized in law as charitable, or whether it is maintained for gain, profit, or private advantage. An institution does not lose its charitable character, and consequent exemption from taxation, by reason of the fact that those recipients of its benefits who are able to pay are required to do so, where no profit is made by the institution and the amounts so received are applied in furthering its charitable purposes, and those benefits are refused to none on account of inability to pay therefor. The fundamental ground upon which all exemptions in favor of charitable institutions are based is the benefit conferred upon the public by them, and a consequent relief, to some extent, of the burden upon the state to care for and advance the interests of its citizens.''

In the light of these authorities it seems clear that a home for the aged which caters to wealthy persons and furnishes them those services and care needed by the old and infirm, rich or poor, does not cease to be a charitable institution so long as its charges do not yield more than actual cost of operation; that it does cease to have that status when the occupants pay more than the cost to the home, thus resulting in a profit and converting it into a noncharitable institution.

Reverting to respondents' contention that the Fifield Manors are luxury homes furnishing more than a reasonable standard of care to its residents, we find it untenable in fact as well as law. Counsel themselves refer to them as ''middle

to high-class living quarters,'' and the pretrial stipulation settles as a fact that "plaintiff's capital investment in such Home is justified by the contemplated use thereof, and is required to serve the interests of the community.''

The argument unduly emphasizes and, we think, misapplies certain language of the Fredericka opinion. In defining the controlling consideration (on page 793) the court uses the phrase "whether such contributions as are made do not exceed what is required for the maintenance of the *institution at a reasonable standard.*'' (Emphasis added.) This seems to refer to the physical plant rather than the care furnished therein. At page 795, in summarizing the evidence and arriving at the conclusion that "the concept of charity in its ordinary sense . . . is met'' the court refers to income "devoted exclusively to affording a reasonable standard of care to such elderly persons for the balance of their lives.'' This seems to have the connotation of reasonable care as the minimum, rather than the maximum of quantity and quality of quarters, meals, entertainment, medical and mental care, etc. Certainly if, as we have held, the occupancy of the home by wealthy but aged and infirm persons does not disqualify it for charitable status there should be and is no requirement that they live upon the standard of the poor or the nearly poor. Be that as it may, the evidence does not warrant the application of the adjective "luxurious'' to the homes in question. Dr. Gruber's affidavit states by way of conclusion, as a result of his survey, that he "is of the opinion that the standard of care maintained at the Fifield Homes is substantially the same or lower than that furnished in the other surveyed homes, all previously tax-exempted, and all of which are maintained for similar care of middle-class aged persons.'' He then particularizes as set forth in the margin.[5]

---

[5]"More specifically, affiant's investigation discloses the following:

"A. *Standard of care equal or higher in presently exempted homes in Los Angeles County.* Compared with Kingsley Manor and Claremont Manor, homes in Los Angeles County for many years exempted under the welfare exemption . . . the following brief conclusion might be noted:

"1. *Special facilities* at both Kingsley Manor and Claremont Manor, particularly the latter, are far more complete than at any of the three Fifield Manors. This is particularly notable in the absence of recreational and hobby equipment at the Fifield Manors as contrasted with the other two tax-exempted Los Angeles County homes.

"2. *Amenities* furnished at the Fifield are substantially the same as at the tax-exempted Los Angeles County homes, excepting for the type of meal service.

Mr. Noon testified that the primary objective of these Homes was care for ''a big group in the middle, self-employed people in the main, teachers and others, who by thrift, accummulate some money in the course of a lifetime but who are apt as a result of a catastrophe or mismanagement, particularly when people become senile, to lose that money and to be left destitute or charges on some form of governmental agency. It is that particular group to whom the efforts of the Manors are directed.'' This is the preponderant group of tenants in the Fifield Manors. The court's findings that the respective Fifield Homes are operated ''as a luxurious apartment hotel for the aged,'' that ''the services furnished and the charges exacted by plaintiff for admission to its apartment hotel are not within the reach of persons of limited means, or of persons in modest

''3. *Life care contracts* at the Fifield Homes equal matters covered at the other two institutions.

''4. *Admission fees:* *Minimum* admission fee at any one of the three Fifield Manors is less than the minimum at Kingsley Manor, if we exclude the amounts charged for rooms without individual bath facilities. Compared with Claremont Manor, where the physical facilities are more comparable, the Fifield admission fees on the minimum are more than 75% lower. *Averages* at all of the Fifield Homes are much lower than at either of the two other Los Angeles County tax-exempted homes. *Maximum* charges for admission, when viewed in the light of per person charges, appear to be lower at all three Fifield Manors than at the exempted Claremont Manor, and substantially the same as the maximum at Kingsley Manor.

''5. *Life care index*, taking into consideration the broad scope of the Fifield contract and the necessary payment of taxes during the past years by the Fifield Homes, as contrasted with the index presently employed at the two Los Angeles County exempted homes, compares favorably with the two Los Angeles County homes.

''B. *Standard of care equal or higher in presently exempted homes in San Diego and Santa Barbara Counties.* Reference to the above survey covered in this affidavit requires, in the opinion of affiant, item by item, the same conclusion as to presently exempted homes for middle-class aged in San Diego and Santa Barbara Counties, which homes were exempted in the past and presently under the welfare exemption by joint action of the State Board of Equalization and the respective County Assessor involved. Thus, it appears specifically:

''1. *Special facilities* in substantially all of the tax-exempted homes exceed those presently maintained at the Fifield Homes.

''2. *Amenities* furnished at the White Sands Home are identical with those furnished by the Fifield Home; at the remaining homes, except in one respect, amenities are equal or superior to those at the Fifield Homes.

''3. *Life contract* provisions are substantially the same in the other surveyed homes except for the broader scope of the Fifield contracts as to mental care and as to optional monthly contracts, the irrevocable feature contained in the Fifield contracts, not present in any other home.

''4. *Admission fees* are considerably higher than at the Fifield Homes.

''5. *Life care index* is, all things considered (i.e., wider scope of Fifield contract and necessity in the past to pay taxes not present in other homes) not less than index used presently at the Fifield Homes.''

circumstances," are not supported by the evidence; there is no conflicting proof or room for divergent inferences in the premises.

The record shows that the Federal Internal Revenue Service has ruled Fifield Manor Wilshire to be exempt from federal income tax as a charitable organization, and also from the exactions of federal gift and estate tax laws. Appellants' opening brief says that similar rulings have been made since the trial with respect to the Hollywood and Pasadena Homes; counsel for respondents do not challenge this assertion.

We conclude that each of the appellants has established as a matter of law that it is a charitable corporation entitled to the welfare exemption.

Each judgment is reversed with instructions to the trial court to amend the findings and conclusions to conform to the views herein expressed, and to enter judgment in each case in favor of plaintiff for the amount specified in the pretrial stipulation filed in the lower court.[6]

Fox, P. J., concurred.

A petition for a rehearing was denied January 31, 1961, and respondents' petition for a hearing by the Supreme Court was denied March 1, 1961. Traynor, J., was of the opinion that the petition should be granted.

---

[6]Found in paragraph XVIII of the pretrial stipulations in the Fifield Manor and Fifield Manor Wilshire cases, and in paragraph XV of the pretrial stipulation in the Fifield Manor Pasadena case.