## MADONNA TOWERS v. COMMISSIONER OF TAXATION.

167 N. W. (2d) 712.

March 21, 1969—No. 41283.

*Douglas M. Head,* Attorney General, *Richard H. Kyle,* Solicitor General, and *Don G. Paterick,* Special Assistant Attorney General, for relator.

*Richard E. Kyle, Samuel L. Hanson, Briggs & Morgan, Thomas Wolf, O'Brien, Ehrick, Wolf & Deaner, Joseph J. Dudley,* and *Dudley, Baird, Smith & Copeland,* for respondent.

*Wright, Simon, Todd & Schmechel, Donald A. Schmechel,* and *P. Cameron DeVore,* for American Association of Homes for the Aging, amicus curiae.

*Smith, Blomquist, Vitko & Rummel, Moritz J. Blomquist,* and *Terry C. Smith,* for Northwest Baptist Home Society, Luther Haven Nursing

Home, Madison Lutheran Home, Saint Vincent Rest Home, and Calhoun Beach Manor, amici curiae.

MURPHY, JUSTICE.

This case is before us on certiorari to review an order of the Tax Court which granted respondent Madonna Towers an exemption from ad valorem taxes against real property in Olmsted County as of May 1, 1965. The issue presented is whether a proposed retirement apartment complex owned by a nonprofit corporation and operated by a religious society is entitled to exemption from payment of ad valorem taxes under Minn. Const. art. 9, § 1, and Minn. St. 272.02(6) as an institution of purely public charity. The management serves elderly patrons who are financially able to make a substantial initial investment with monthly payments thereafter in return for which an attractive, social, and therapeutic environment is provided.

It appears from the record that Madonna Towers is the project of the Oblate Fathers, a religious order. The Order is engaged in the development and operation of Catholic institutions including parishes, schools, orphanages, retreat houses, and nursing homes for the aged. Its activities are generally supported by free-will donations. The Order is prohibited by church law from engaging in profitmaking activities, and its members take a vow of poverty. The Order established Madonna Towers as a nonprofit corporation under Minn. St. c. 317 empowered to construct, purchase, and maintain, "to sell or otherwise dispose of rest homes, apartments and homes for the aged or retired," and to operate and manage retirement homes. The articles of incorporation provide that it "shall not afford pecuniary gain, incidentally or otherwise, to its members." It is managed by professed members of the Order.

It would appear that the Order acquired property in Rochester, Minnesota, and constructed the Madonna Towers retirement home at a cost of about $4 million. It is a 12-story apartment building with 9 additional townhouses. The physical plant is distinguished from an apartment complex by the existence of a chapel and infirmary, a dining hall, sewing rooms, and other public rooms which can be utilized by nonCatholics for services if they so desire. In addition to the availability of nurses and one

or two doctors, provisions are made for furnishing one meal each day in the dining hall, weekly maid service, and bed and bath linens. With reference to medical care, the contract provides:

*"Medical, Surgical and Hospitalization Insurance.* The Resident shall have adequate medical, surgical and hospitalization insurance coverage at all times, the cost of which shall be paid by the Resident. All Residents who are eligible for Medicare will be encouraged to enroll in all available aspects of the program. Copies of policies evidencing such insurance coverage shall be filed with the administrator."

The construction of the premises was financed by the sale of bonds guaranteed by the Oblate Fathers. The bonds, including interest, will be retired by using funds obtained from membership fees to be paid by the patrons. The life-residence fee ranges from $9,900 to $19,900, depending upon the accommodations provided. This charge is to be paid only once, and if an applicant who otherwise qualifies for admission is unable to make the payment, then relatives and friends, fraternal organizations, service clubs, or other sources will be solicited to make the payment.

There is some testimony in the record that the home may have guests who may not be able to pay. We gather that the thrust of this evidence is that the home may make provision for charity cases. Part of the testimony on this phase of the operation is given by the Provincial of the Central Province of the Order:

"Mr. Sicora [Special Assistant Attorney General]: Is anyone going to get into Madonna Towers if they do not have the membership fee?

"Father Coovert: I think so. There are all of these other avenues, if I can talk a labor union into sponsoring a few, the Knights of Columbus, big companies—or even by introducing these people to people who can help them. We won't turn anyone away, in other words, because of that. We will try to make it up ourselves if we can't do it any other way.

\* \* \* \* \*

"Mr. Sicora: Would you go over again and tell us exactly how you expect to retire the debt?

"Father Coovert: Through these memberships. By using the funds

that come in on memberships to pay back these bonds, to redeem these bonds.

\* \* \* \* \*

"MR. TODD [Vice Chairman of Court]: \* \* \* From the information you received is it contemplated that the person who pays the membership fee will have a tax deductible contribution?

"FATHER COOVERT: I don't think that is allowed."

In addition to the membership fee, each patron is required to pay a monthly service charge which ranges from $175 to $275 per month, depending upon the accommodation. It is suggested that this cost would defray interest and maintenance charges. It is projected that there will be an annual deficit of $19,000. If an occupant, after admittance to the home, is later unable to pay the service charge, he will still be permitted to remain in the home. This would not be true, however, of one who might become incapacitated as a result of mental illness. Such a person would have to be hospitalized elsewhere at his own expense.

Since the cost of the project must be financed by payments to be received from its patrons, it is not contemplated that the services and facilities of the institution will be generally available to the sick or the indigent. Among the qualifications for membership are the following:

"*Eligibility.* Only persons of good moral character, not afflicted with any contagious, infectious, or mental disease, or any other disease or illness considered to be objectionable, shall be eligible for admission to the Apartment Community. Only persons applying for and intending life residence shall be admitted."

The rules further provide:

"*Physical Examination.* The Applicant must submit to the Towers a physician's written report covering a physical examination of the Applicant made within a 60 day period prior to the Applicant's Application. The Towers also may require a physical examination of Applicant by a Towers' physician prior to admittance to the Apartment Community. The determination by the Towers as to whether or not the Applicant or Resident is disabled, either physically or mentally, to such an extent that he is not qualified to enter the Apartment Community shall be final."

It appears that the home is open to the public with no restrictions as to race, color, or creed. The minimum age is 62 years, and the applicant must be ambulatory.

Madonna Towers seeks exemption from payment of ad valorem taxes under Minn. Const. art. 9, § 1, and Minn. St. 272.02(6) as an institution of purely public charity. These provisions of the law have been discussed in innumerable Minnesota cases, and in considering whether Madonna Towers possesses the attributes of exemption which the law accepts, it is appropriate to refer only to the most recent authorities. In the latest case, Camping and Education Foundation v. State, 282 Minn. 245, 164 N. W. (2d) 369, we held that a nonprofit organization which operated a summer camp and made charges to those who attended, although some were admitted free on a scholarship basis, was not entitled to exemption from real estate taxes. We viewed the operation as basically a commercial activity, the charitable aspects of which were incidental, and said that it would be required to share the burden of government along with the general public. In State v. Evans Scholars Foundation, 278 Minn. 74, 153 N. W. (2d) 148, we held that property used to house university students who are beneficiaries of a scholarship program affording board and room and tuition to selected students of exceptional ability was not devoted to a purely public charity because the beneficiaries were restricted to a limited category of youths.

On the other hand, in In re Junior Achievement of Greater Minneapolis, Inc. 271 Minn. 385, 135 N. W. (2d) 881, we held that real estate used by a corporation to develop the understanding of young people concerning the relationships within and functions of the American free enterprise system. by having them participate in projects which were made possible by contributions from different donors was qualified as a purely public charity entitled to exemption since the contributions which supported the program were applied consistently with existing law for the benefit of an indefinite number of persons in a constructive educational endeavor. The program contributed to the betterment of society by lessening the burdens of government and by making a contribution to the public good. The same result was reached in the case of In re Claim of Assembly Homes, Inc. v. Yellow Medicine County, 273 Minn. 197,

140 N. W. (2d) 336, where we reversed the district court's denial of exemption to a nursing home. We held that the corporate operator, which kept the home open to the public and used any profits from its operation toward furtherance of the work of the nursing home, which received fees for its services from individual patients, county welfare boards, and the Veterans Administration, as well as private donations of money or service, and which did not permit its shareholders to receive dividends, was a "purely public charity" exempt from taxation. In deciding that this particular nursing home was entitled to exemption, we emphasized that it also functioned as a hospital and provided services to recipients of public welfare.

In comparing these fact situations with those which appear in the record before us, we have little difficulty in concluding that Madonna Towers does not possess the necessary qualities of an institution which serves a purely charitable purpose. Madonna Towers does not propose to care primarily for the ill and indigent, as did Assembly Homes, Inc. Nor does it possess the purpose of extending its beneficence to an indefinite number of persons, which characterized Junior Achievement of Greater Minneapolis as a charity entitled to exemption. On the other hand, it would seem that because of its restrictions and limitations as to those it would aid, it comes within the proscriptions of State v. Evans Scholars Foundation, *supra*, and Camping and Education Foundation v. State, *supra*.

It may be observed that Madonna Towers is structured in form, if not in substance, to qualify as an institution of public charity. There is the concurrence of religious ownership and use of the real estate;[1] it is not operated with a view of generating private profit;[2] its functions broadly serve a need of humanity and make a contribution to the public good which is deemed worthy of encouragement;[3] it is proposed that the

---

[1] See, State v. Willmar Hospital, Inc. 212 Minn. 38, 2 N. W. (2d) 564; Christian Business Men's Committee v. State, 228 Minn. 549, 38 N. W. (2d) 803.

[2] See, State v. Browning, 192 Minn. 25, 255 N. W. 254; County of Hennepin v. Brotherhood of Gethsemane, 27 Minn. 460, 8 N. W. 595.

[3] See, Christian Business Men's Committee v. State, *supra*; In re Junior

property will be used directly and immediately to accomplish a charitable purpose;[4] and that the services provided will be available to the general public without restriction.[5] We cannot agree, however, that the record supports the conclusion that its charitable aids reach an indefinite number of people. Whatever evidence there may be in the record to support that conclusion is too equivocal and unrealistic to warrant acceptance. The petitioner relies on the finding of the Tax Court to the effect that "[n]o worthy person will be denied admission because of inability to pay the membership fee." This finding cannot be reconciled with the basic plan of the project to create the capital structure by the proceeds of the membership fee. Essentially, the concept of the sponsors is that the institution will provide the good life for elderly people who can afford it and who have the health to enjoy it. If the financing of the operation is to be successful, the patronage of the indigent and unwell would not be sought or encouraged.

Counsel for respondent have submitted impressive authority to sustain the conclusions reached by the Tax Court. They call attention to the White House Conference on Aging Act, 72 Stat. 1746, which refers to the increasing number of people who have passed the age of 65 and are unprepared for the adjustments which they are called upon to make by retirement. This act probably expresses a sociologically sound policy which would encourage programs to cushion the "retirement shock" to which the aging and retired persons are exposed. Recognizing that people in later years have special care and residential requirements and that alleviation of fears and emotional stress is of social value, a number of courts have granted tax exemptions where the needs of the elderly are met by institutions not organized or operated for private profit. Under

---

Achievement of Greater Minneapolis, Inc. 271 Minn. 385, 135 N. W.(2d) 881.

[4] See, Christian Business Men's Committee v. State, *supra*; State v. Second Church of Christ, Scientist, 185 Minn. 242, 240 N. W. 532; Village of Hibbing v. Commr. of Taxation, 217 Minn. 528, 14 N. W. (2d) 923, 156 A. L. R. 1294.

[5] See, State v. Evans Scholars Foundation, 278 Minn. 74, 153 N. W. (2d) 148.

facts similar to those presented here, courts have held that such institutions serve a purpose in providing a healthy social environment, preventing physical and mental deterioration, and providing rehabilitation and a continuance of a useful life. Poverty is not a necessary ingredient in determining the charitable nature of the program. The controlling consideration, according to these authorities, is that the contribution of the beneficiary to the cost of the operation should not exceed the cost of the service and facilities provided to him. Nor is it important that the contribution of the beneficiary is beyond the reach of a person of modest means. The luxury of the surroundings in which the beneficiary lives is not determinative of the issue of charity so long as the institution is not making a profit. The foregoing summary is drawn from a number of authorities, including the California cases of Fredericka Home for the Aged v. San Diego County, 35 Cal. (2d) 789, 221 P. (2d) 68; Fifield Manor v. County of Los Angeles, 188 Cal. App. (2d) 1, 10 Cal. Rptr. 242; In re Estate of Henderson, 17 Cal. (2d) 853, 112 P. (2d) 605; Pacific Home v. County of Los Angeles, 41 Cal. (2d) 844, 264 P. (2d) 539; Solheim Lutheran Home v. County of Los Angeles, 152 Cal. App. (2d) 775, 313 P. (2d) 185; The Samarkand of Santa Barbara, Inc. v. County of Santa Barbara, 216 Cal. App. (2d) 341, 31 Cal. Rptr. 151. See, also, In re Tax Appeals of United Presbyterian Homes, 428 Pa. 145, 236 A. (2d) 776; Topeka Presbyterian Manor v. Board of County Commrs. 195 Kan. 90, 402 P. (2d) 802.

The notion that a well-appointed establishment, supported by substantial entrance fees and monthly charges, may serve a purely public charity appears full blown in the recent case of Bozeman Deaconess Foundation v. Ford, 151 Mont. 143, 439 P. (2d) 915. In that case the home was built for approximately $2 million and required the payment of life-care occupancy fees ranging from $7,000 to $32,000 and monthly maintenance charges of $150 to $250. The Montana court followed the California authorities and said: "To qualify as a charity does not require that it have an exclusive relationship to the poor, and its charitable status is not destroyed by the charging of fees for admission and maintenance." 151 Mont. 148, 439 P. (2d) 917.

This concept has had an interesting development in Florida. By legis-

lative enactment, the State of Florida has chosen to grant exemption from ad valorem taxes to housing for the elderly. Previously, the Florida Court of Appeals in Haines v. St. Petersburg Methodist Home, Inc. (Fla.) 173 So. (2d) 176, had ruled that a comparable operation was not exempt. In Jasper v. Mease Manor, Inc. (Fla.) 208 So. (2d) 821, the Florida Supreme Court accepted the definition of the legislature which attributed a charitable purpose to the operation of a home under the stated conditions "for persons who are chronologically aged without regard to dependence or independence otherwise." 208 So. (2d) 825. It appears that in accepting the definition as a legislative prerogative the Florida court was obviously influenced by the fact that the act provided the mechanics for an annual reexamination of the status and use of such property. The court said that this annual reexamination "turning on title and use of the property, has been sustained as a logical means of determining taxability from year to year, and the practice should be of particular value in preventing any abuse or attempt to circumvent the basic purposes of the statute involved in this case." 208 So. (2d) 826.

Unlike Minnesota, where the exemption sanction is found in the Constitution and is limited to a purely public charity, the Wisconsin provision for exemption is found in the statute and includes "benevolent nursing homes and retirement homes for the aged." Wis. Stat. Ann. § 70.11(4). In Milwaukee Protestant Home v. City of Milwaukee, 41 Wis. (2d) 284, 164 N. W. (2d) 289, a divided court held that a retirement home whose plan of operation was similar to that of Madonna Towers was exempt under this provision. In a vigorous dissent, it was pointed out that the operation was substantially the same as a private, commercially operated convalescent home not exempt from taxation. The dissent said (41 Wis. [2d] 309, 164 N. W. [2d] 302):

"We cannot refrain from comparing the resident of Bradford Terrace, affluent enough to pay the founder's fee in full before admission and with a portfolio attractive enough to assure his monthly payments, with the elderly owner of a modest home with assets or income hardly sufficient to sustain himself. The Bradford Terrace resident pays no taxes for his living facilities (nor does Bradford Terrace), while the owner of the modest home must."

The minority was particularly bothered by the commercial aspects of the relationship and observed that the size of the apartment and facilities furnished were unrelated to the element of need and were fixed by the founder's fee. Neither were the additional monthly charges regulated by need or ability to pay but rather by the services rendered.

There is, however, an equally respected line of out-of-state authorities which denies exemptions to retirement homes for various reasons. One jurisdiction holds that tax exemptions are subject to strict construction, and since they are the antithesis of equality and uniformity, the home should not be given exemption, even if it is operated at a financial loss, since the patrons are people who are able to pay their way. The Texas court in Hilltop Village, Inc. v. Kerrville Ind. School Dist. (Tex.) 426 S. W. (2d) 943, 949, which involved a church-sponsored home for the elderly, said that to be entitled to exemption, "the institution must be one whose properties and assets are pledged in perpetuity to the relief of persons in financial need and to their assistance in obtaining the care they must have to prevent their becoming a burden on society."

The Ohio court would characterize an establishment such as Madonna Towers as a private housing project. Philadelphia Home Fund v. Board of Tax Appeals, 5 Ohio St. (2d) 135, 214 N. E. (2d) 431; Crestview, Inc. v. Donahue, 14 Ohio St. (2d) 121, 236 N. E. (2d) 668.

The Illinois court in a case similar on the facts to the one before us, Methodist Old Peoples Home v. Korzen, 39 Ill. (2d) 149, 158, 233 N. E. (2d) 537, 542, characterized the plan of operation—including the substantial entrance fee, the variance in accommodations, and the health requirements—as a proposal "lacking in the warmth and spontaneity indicative of charitable impulse."

The Oregon court in Methodist Homes, Inc. v. Tax Commr. 226 Ore. 298, 360 P. (2d) 293, likewise took the view that the restrictive character of the admission requirements and the commercial approach in allocating accommodations militated against the argument that the purpose was charitable within recognized constitutional standards. In Friendsview Manor v. Tax Commr. 247 Ore. 94, 420 P. (2d) 77, 427 P. (2d) 417, the court in discussing the relationship between the patrons and the

institution, observed that the people who provide the capital for the institution are also its beneficiaries and said (247 Ore. 100, 420 P. [2d] 80):

"\* \* \* This is identical to what exists when an individual aged person provides his own home or a group of aging persons constructs a cooperative apartment. The purpose in all three is providing housing for the aging, a charitable purpose. It is not suggested that the latter two categories also should have tax-exempt housing.

"\* \* \* [T]he basic deficiency in the Manor's reasoning is that it would grant a charitable tax exemption to housing for aging persons paid for by these same aging persons.

"If the [petitioner's] contention is correct, the charitable tax exemption must be granted to many other self-help projects that provide services which if provided *to others* are held to be for charitable purposes."

In In re Junior Achievement of Greater Minneapolis, Inc. *supra*, we discussed what was meant by a "purely public charity," which is exempt from taxation under our law, and added that the exemption depends upon the particular facts in each case, and the burden of proof rests with the petitioner who seeks the exemption. In determing the qualifications for exemption, we have, in the Minnesota authorities cited, considered the motivation of the gift, whether it is applied consistently with existing law, whether it is restrictive or limited, on the one hand, or for the benefit of an indefinite number of persons on the other, whether it serves a religious or educational purpose, whether it relieves disease or suffering, provides public buildings or works, or otherwise lessens the burden of government.

It is difficult for us to agree that an elderly person is the beneficiary of a charity under circumstances where he contributes a substantial sum of money to the capital structure of an establishment, and in return therefor acquires the right of use and occupancy for life. It seems to us that by the use and occupancy of the premises he is exercising a right to an interest or property which he has in fact purchased. This arrangement, to our way of thinking, is more akin to a long-term lease or participation in a commercial venture than to a charitable arrangement. Basicially, the

occupants of Madonna Towers will be provided with living accommodations that are similar to that which other persons may acquire by renting an apartment or buying a house. Unlike the others, however, the occupants here do not contribute in taxes. This would not seem fair or consistent when it is kept in mind that the less favored among the elderly would be denied the same advantage.

At this point it might be appropriate to observe that the Minnesota Legislature has considered the problems of the elderly from the standpoint of adjusting their tax burdens to the diminished income that comes with retirement. The legislature has done this by allowing credits against income for expenditures for rents and taxes. Senate File 41, approved February 21, 1969, (L. 1969, c. 17) entitled, "An Act relating to taxation; income tax credits for certain elderly taxpayers; amending Minnesota Statutes 1967, Sections 290.0601, Subdivision 9, and 290.0608." Obviously, the exemption asked for by Madonna Towers would give to its patrons benefits substantially in excess of those granted to other elderly citizens by the legislature.

Moreover, we must, in the final analysis, recognize that not every retirement home serves a purely charitable purpose. It would be unrealistic to ignore the fact that the health-care industry is a rapidly growing segment of our economy,[6] and whether or not a retirement home is entitled to an exemption must be judged by the standards herein expressed. It should be noted that this court is at a disadvantage in reviewing the record before us in that it tells us nothing of how the institution operates with reference to the practices followed and services provided. The record before us is largely a prospectus of the intended plans and operation by the proponents. Since the parties feel that the record is adequate for a determination of the issue, we have taken them at their word.

The determination of the Tax Court is accordingly reversed. It is unnecessary for us to observe that the petitioner may renew its application if it feels that it can establish from its actual experience in the conduct of

---

[6] New York Times, March 3, 1968, Wall Street is Analyzing Convalescent Home Potential; Barron's National Business and Financial Weekly, February 10, 1969, and later articles on nursing homes.

the project that it is functioning as a purely public charity within the purview of the views expressed herein.

Reversed.

MR. JUSTICE OTIS took no part in the consideration or decision of this case.