453 P.2d 989

**MEMORIAL HOSPITAL, a non-profit Arizona corporation, Appellant,**

v.

**C. L. SPARKS, Maricopa County Assessor; John A. Foote, Maricopa County Treasurer; B. W. Burns, L. Alton Riggs and William S. Andrews, members of the Maricopa County Board of Supervisors; and William E. Stanford, L. Waldo DeWitt and John M. Hazelett, members of the Arizona State Tax Commission, Appellees.**

No. 1 CA–CIV 666.

Court of Appeals of Arizona.

April 29, 1969.

Rehearing Denied May 19, 1969.

Review Denied June 10, 1969.

Allen L. Feinstein, Phoenix, for appellant.

Beer & Kalyna, by Olgerd W. Kalyna, Phoenix, for appellees Maricopa County Assessor, Maricopa County Treasurer, Maricopa County Board of Supervisors.

Gary K. Nelson, Atty. Gen., Darrell F. Smith, former Atty. Gen., by James D. Winter, Asst. Atty. Gen., for appellees Arizona State Tax Commission.

CAMERON, Judge.

This is an appeal from a judgment of the Superior Court of Maricopa County which found that property owned and operated by Memorial Hospital under the name of Memorial Senior Citizens Towers was not entitled to an exemption from real property taxation.

The named appellees appeared in their official capacity and remain in the caption even though some have been succeeded in office. This opinion shall have the same effect as though the current office holders had been substituted as parties-appellee.

We are called upon to determine whether the property as used is entitled to a real property tax exemption under the Constitution and laws of the State of Arizona as a charitable institution.

Memorial Hospital is a non-profit corporation existing under the laws of the

State of Arizona. It is and has been since its inception exempt from federal and State taxation as a charitable institution. Its principal purpose has been in the operation of a privately owned community hospital known as Memorial Hospital. The hospital depends primarily upon fees from patients to maintain its operation, although it has received some amounts from local fund drives, as well as limited subsidies for cancer research, and matching fund grants through federal programs for hospital construction.

In 1962 Memorial Hospital entered into an agreement with the Housing and Home Finance Agency of the United States government for a loan in the amount of $1,816,000 for construction of two 10-story buildings containing 153 housekeeping units or apartments. The apartments were built for elderly and aged families or persons. Before obtaining the loan, the hospital obtained a written statement by the then Maricopa County Assessor that the Senior Citizens Towers would be "exempt from ad valorum tax as a hospital operation". The rent schedule as approved by the Housing and Home Finance Agency for the apartments was $65 per month for a studio; $77 per month for a one bedroom; and $95 per month for a two bedroom apartment and took into account this tax exemption. In addition to the above rental charges, $6.00 per month for utilities is added.

The testimony indicates that Memorial Hospital provides the administration for the Towers, the Towers being administered from the office of Memorial Hospital itself. All of the housekeeping and cleaning of the public areas and corridors is done by hospital employees. In addition to handling the administration of the Towers, the hospital maintains a diagnostic office in the Towers for use by physicians for the tenants and the Towers has been approved for long-term care under the Medicare Program of the United States government and the tenants are covered by a special hospital-negotiated sickness and accident insurance plan. The occupants of the Towers are allowed to purchase drugs from the hospital at a discount and they receive discounts for out-patient services including laboratory, x-ray, and physical therapy. They are also "screened regularly through the cancer clinic at half price." The tenants have the use of the hospital cafeteria and food trays from the dietary kitchen of the hospital are sent over to the residents of the Towers when they are ill.

At the trial the administrator, who was the only person to testify, was questioned (on cross-examination) concerning the requirements for occupancy as follows:

"Q BY MR. KALYNA: Now, before a person can be admitted as a tenant you have indicated certain requirements. Now, there are no maximum income requirements for a tenant, is there?

"A No.

"Q In other words, a man can be making $100,000 a year and * * * could qualify?

"A No, we wouldn't let him in.

"Q Well, where do you draw the line?

"A We try to keep under $3,000 for annual income. There are a few that have income more than that, retired Army officers, for instance, who are sick or have heart conditions.

"Q Now, one of the other requirements—but do you require that they have to be able to pay their rent when they are first qualified as tenants?

"A That's correct.

"Q You said that the hospital could subsidize some of the rent. Has it directly?

"A Yes.

"Q    In what way?

"A    By carrying tenants who have not been able to pay their rent.

"Q    But you have not admitted anyone who had come in and said, I am unable to pay, let me live for free, have you?

"A    No."

The testibony of Mr. McLoughlin also indicated that of 123 tenants, 9 had an annual income of less than $500 per year; 11 between $500 and $1,000; and 18 between $1,000 and $1,500. None of the 123 tenants had an annual income over $3,300. The record also shows that prior to the trial the Towers received rent supplement payments in the amount of $14,400 from the federal government.

Before construction of the Towers the hospital received a tax exemption on the complete parcel of land upon which the hospital was located consisting of some 6 undivided city blocks. After the Towers were constructed, the County Assessor placed the said Towers and that portion of the real estate upon which it was located on the tax rolls. Memorial Hospital brought an action for declaratory judgment asking that the property be found to be exempt from "ad valorum taxes under Article 9, Section 2 of the Arizona Constitution and under A.R.S. § 42–271." From an adverse judgment plaintiff appeals.

■■■■    The Arizona Constitution, A.R. S. at the time the action was brought read in part as follows:

"Section 2.    TAX EXEMPTIONS. There shall be exempt from taxation all federal, state, county and municipal property. Property of educational, *charitable* and religious associations or institutions not used or held for profit may be exempt from taxation by law. * * * All property in the state not exempt under the laws of the United States or under this constitution, or exempt by law under the provisions of this section shall be subject to taxation to be ascertained as provided by law. This section shall be self-executing." (emphasis added)

The Arizona Revised Statutes provide:

"All property in the state shall be subject to taxation, except:

\*      \*      \*      \*      \*      \*

"4.    Hospitals, asylums, poor houses and other charitable institutions for relief of the indigent or afflicted, and the lands appurtenant thereto, with their fixtures and equipment, not used or held for profit." § 42–271 A.R.S.

Our Supreme Court has made it clear that exemption from taxation is not presumed, but on the contrary exemption is the exception and not the rule in this State. State of Arizona v. Yuma Irr. Dist., 55 Ariz. 178, 99 P.2d 704 (1940), Pothast v. Maricopa County, 43 Ariz. 302, 30 P.2d 840 (1934). Our Supreme Court has stated:

"The purpose of the constitutional provision is that all of the property in the state should bear its just burden of the taxes, and it makes no difference in whose name or under what description the property is assessed if both it and its valuation are properly represented on the tax roll, either directly or indirectly." Brophy v. Powell, 58 Ariz. 543, 554, 121 P.2d 647, 652 (1942).

Unlike the veteran's or widow's exemptions which are personal to the person claiming the exemption, charitable exemptions are based on the use to which the property is put by the applicant for the exemption. The fact that the property is owned by Memorial Hospital which is itself tax exempt is not controlling. The charitable use tax exemption depends solely upon the use made of the property. Bethesda General Hospital v. State Tax Commission, 396 S.W.2d 631 (1965).

Many courts have held that where the home charges rent to those able to pay the

institution is not a "purely public charity" and accordingly not exempt from ad valorem taxation. Hilltop Village, Inc. v. Kerrville Ind. Sch. Dist., Tex.Civ.App., 410 S.W.2d 824 (1966). Where "founders fees" were charged for admission to those able to pay no exemption was allowed even though the purposes of the non-profit corporation were a combination of religious, charitable, and other purposes. Presbyterian Homes v. City of Bradenton, Fla., 190 So.2d 771 (1966). Even where the non-profit corporation was a social welfare arm of a church and the church auxiliary raised money to subsidize residents unable to pay and where the mortgage payments had exceeded income the property was not tax exempt. In re Application for Exemption of Real Property from Taxation by Lutheran Senior City, Inc., 9 Ohio St.2d 151, 224 N.E.2d 352 (1967). See also Friendsview Manor v. State Tax Commission, 247 Or. 94, 420 P.2d 77, 427 P.2d 417 (1966).

Although most courts agree with Arizona that every presumption is against a tax exemption, Brophy v. Powell, supra, many jurisdictions will allow a tax exemption where it is shown that in addition to the charitable and beneficial nature of the operation there is shown a lack of profit derived from the operation. The California court has been most liberal in this regard:

"In the light of these authorities it seems clear that a home for the aged which caters to wealthy persons and furnishes them those services and care needed by the old and infirm, rich or poor, does not cease to be a charitable institution so long as its charges do not yield more than actual cost of operation; that it does cease to have that status when the occupants pay more than the cost to the home, thus resulting in a profit and converting it into a non-charitable institution." Fifield Manor v. County of Los Angeles, 188 Cal.App.2d 1, 10 Cal.Rptr. 242, 254 (1961).

And the Kansas court has held a church affiliated home for the aged is entitled to tax exemption as a charitable institution when it operates at a deficit even though it charged an admission fee. Topeka Presbyterian Manor v. Board of County Com'rs, 195 Kan. 90, 402 P.2d 802 (1965). We agree with the Massachusetts court which stated:

"As we have said many times, charity and charitable corporations are not limited to almsgiving but comprehend a wider field of activity for the improvement and happiness of man. (citations omitted) While new objects have been and must be added to comprehend the wide variety of gifts which may be classed as charitable, 'the more remote the objects and methods become from the traditionally recognized objects and methods [—relief, religion, education and public works—] the more care must be taken to preserve sound principles and to avoid unwarranted exemptions from the burdens of government.' (citations omitted)

"Whether an institution is in its character literary, benevolent, charitable or scientific will depend upon the declared purposes and the actual work performed. (citations omitted) An institution will be classed as charitable if the dominant purpose of its work is for the public good and the work done for its members is but the means adopted for this purpose. But if the dominant purpose of its work is to benefit its members or a limited class of persons it will not be so classed, even though the public will derive an incidental benefit from such work." Massachusetts Medical Soc. v. Assessors of Boston, 340 Mass. 327, 164 N.E.2d 325, 328 (1960).

Without selecting any one indicia we believe that the sum total of the uses to which the Towers are put indicate that it is a charitable institution within the meaning of the Arizona Constitution and the Arizona Revised Statutes. It is true that upon first application the hospital re-

**482**

quires some form of financial support 'from the people making application to rent.' The operation is structured to a class of people who under normal conditions would not be able to receive the type of accommodations provided. It is also just as clear that this is not a facility designed for profit. As Mr. McLoughlin stated:

"Q In other words, Mr. McLoughlin, under this plan the hospital would furnish protective economical housing as the first step, nursing home care is the second step, and hospitalization during this period of time or during the time of last illness, is that correct?

"A That is correct."

Also it was testified by Mr. McLoughlin:

"Q Now, Mr. McLoughlin, if by any chance the Towers become full and possibly a new rent schedule, higher rent schedule being approved by the Government, and you should begin to realize more cash than is necessary in order to meet the mortgage payments and the expenses, under the terms of your contract what would have to be done with this excess money?

"A It would have to be turned over to the Government to reduce the mortgage. That would be the primary thing. The second point would be that if such a day should come, that also the rents would be reduced."

This Court is not in a position to determine what the future status of this property would be should the mortgage be paid off completely and the hospital should attempt to make a profit from the rentals. We can only say under the facts in this case the hospital has shown sufficient evidence to justify a tax exempt status.

The judgment is reversed and the matter remanded for proceedings consistent with this opinion.

DONOFRIO, C. J., and STEVENS, J., concur.