**EVANGELICAL RETIREMENT HOMES OF GREATER ST. LOUIS, INC., d/b/a Friendship Village of West County, Appellant,**

v.

**STATE TAX COMMISSION OF MISSOURI, et al., Respondents.**

No. 65058.

Supreme Court of Missouri,
En Banc.

April 16, 1984.

Rehearing Denied May 15, 1984.

Carroll J. Donohue, Fred A. Eppenberger, Carol A. Rutter, St. Louis, for appellant.

Dennis C. Affolter, Thomas W. Wehrle, Clayton, for respondents.

John B. Williams, Michael F. Dandino, Ulysses Clayborn, Kansas City, and Thomas E. Tueth, St. Louis, amicus curiae.

GUNN, Judge.

The subject of this appeal is the charitable tax exemption status of a retirement home for a particular category of persons 62 years of age or older. The State Tax Commission denied tax exemption status of certain property of appellant, Evangelical Retirement Homes of Greater St. Louis, Inc. Appeal to the Circuit Court of St. Louis County affirmed the Tax Commission, and the matter is lodged in this Court which has exclusive jurisdiction by virtue of the involvement of the construction of state revenue laws. Mo. Const. art. V, § 3.

Evangelical Retirement Homes of Greater St. Louis, Inc. (Evangelical), is a not-for-profit Missouri corporation, organized under Chapter 355, RSMo 1978. It owns and operates a retirement home located in St. Louis County which was placed on county real and personal property tax rolls in 1978. Evangelical thereafter filed a complaint for review of assessment with the State Tax Commission (Commission) claiming exemption for the home as "property ... actually and regularly used exclusively ... for purposes purely charitable and not held for private or corporate profit ...." Section 137.100(5), RSMo 1978.

After a hearing and relying on *Franciscan Tertiary Province of Mo., Inc. v. State Tax Commission,* 566 S.W.2d 213 (Mo. banc 1978), the Commission issued its order affirming the assessment, concluding that the home's services to its residents did not directly or indirectly benefit society, and as a result, the home did not qualify for tax-exempt status.

On review, the circuit court affirmed the Commission. We, too, affirm the Commission, and follow and reaffirm the guideposts on this subject established in *Franciscan.*

Evangelical's attack on the judgment is four-fold: first, that the circuit court erroneously applied the wrong standard of review in failing to exercise its independent judgment in light of the evidence; second, that the Commission erroneously construed § 137.100(5), by taking into account the financial status of the home's elderly residents; third, that the evidence demonstrates Evangelical's compliance with the requirement for tax-exempt status under a proper construction of § 137.100(5); and, fourth, that the circuit court erroneously concluded that the appeal was not effective for the 1978 tax year.

The following facts are supported by competent and substantial evidence appearing in the record. The property owned by Evangelical contains residential and non-acute medical care facilities, with various service and recreational facilities. Admission is available only upon application to the governing board, and applicants must meet certain requirements. They must be 62 years of age or older, in reasonably good health and able to care for themselves at the time of admission. Applicants must have sufficient monthly income to cover a monthly fee of between $358 and $530 and any personal needs not provided by the home. The home provides one daily meal without extra charge; any others are paid for by the residents. Applicants are required to be covered both by Medicare (parts "A" and "B") and by supplemental health insurance acceptable to Evangelical. Prospective residents must also have sufficient assets to pay an initial endowment of between $20,000 and $40,000 (depending on the size of the residential unit), with an equivalent amount of additional assets remaining in reserve. In this regard, the residents can scarcely be categorized as sybarites; living "comfortably" would be a more apt expression.

Once admitted, residents are entitled to the use of their apartment and the common facilities of the home for life or until the residential agreement is terminated by either the resident or Evangelical. It is the policy of Evangelical, as stated in the agreement, not to terminate a residency "solely because of the financial inability of a resident to pay the monthly fee." However, this policy is expressly conditioned upon the resident's establishing facts sufficient to justify a waiver. Moreover, any waiver is subject to the sole discretion of Evangelical to determine that there would

not be any impairment of its ability to operate the facility on a sound financial basis. Additionally, Evangelical retains the right under the agreement to terminate a resident for failure to pay any monthly fee when due unless other mutually satisfactory arrangements have been made. Residents may also be terminated as a result of physical disease for which the home is not licensed to provide medical care. The home does not maintain acute care facilities.

Waiver of fees in individual circumstances has occurred, but such waivers have never aggregated more than one per cent of the home's gross monthly income. At the time of the hearing, Evangelical was discounting the fees of a single financially distressed resident to the sum of $800. This was out of total 1980 budget revenues of $3,175,550 and expenses of $3,057,289.

■■■ Evangelical's first argument, that the circuit court erred in applying the wrong standard of review, is not supported by the definitive role of the reviewing court under § 536.140, RSMo 1978. Under that section, the circuit court's affirmance of an administrative decision or order may not be reversed on subsequent appeal solely on the basis of an error of law committed by the circuit court which is unrelated to the merits of the appeal. The reviewing court reviews the findings and decision of the administrative agency and not the judgment of the circuit court. *Fleming Foods of Mo., Inc. v. Runyan*, 634 S.W.2d 183, 184 (Mo. banc 1982). A circuit court may apply the wrong standard of review, yet arrive at the correct results on the merits of the appeal. In that case, the attention

of the appellate court sitting in review is properly focused on the validity of the agency's order, under the appropriate standard of review, rather than on the standard which the circuit court chose to employ.

Evangelical is correct in asserting that there are two distinct and mutually exclusive standards of review provided by § 536.140 and that its challenge to the Commission's order must, at least in part, be judged under the second of these two standards.

■■■ The general standard of review in administrative appeals is found in § 536.-140.2.[1] Under that subsection, review is ordinarily limited to a determination of whether the agency's action was supported by competent and substantial evidence upon the whole record or whether it was arbitrary, capricious, unreasonable, unlawful or in excess of its jurisdiction. *Ross v. Robb*, 662 S.W.2d 257, 259 (Mo. banc 1983); *Barnes Hospital v. Missouri Commission on Human Rights*, 661 S.W.2d 534, 535 (Mo. banc 1983).

■■■ However, subsection 536.140.3 provides an alternative standard of review in cases where act complained of "involves only the application by the agency of the law to the facts." Section 536.140.3, RSMo 1978. In such case, "the [reviewing] court may weigh the evidence for itself and determine the facts accordingly," although "[i]n making such determination the court shall give due weight to the opportunity of the agency to observe the witnesses, and to the expertness and experience of the particular agency." *Id.; Missouri Church of Scientology v. State Tax Commission*, 560

---

1. Section 536.140.2 provides, in pertinent part:
 The inquiry may extend to a determination of whether the action of the agency
 (1) Is in violation of constitutional provisions;
 (2) Is in excess of the statutory authority or jurisdiction of the agency;
 (3) Is unsupported by competent and substantial evidence upon the whole record;
 (4) Is, for any other reason, unauthorized by law;
 (5) Is made upon unlawful procedure or without a fair trial;

 (6) Is arbitrary, capricious or unreasonable;
 (7) Involves an abuse of discretion.
 The scope of judicial review in all contested cases, whether or not subject to judicial review pursuant to sections 536.100 to 536.140, and in all cases in which judicial review of decisions of administrative officers or bodies, whether state or local, is now or may hereafter be provided by law, shall in all cases be at least as broad as the scope of judicial review provided for in this subsection ....

S.W.2d 837, 838 (Mo. banc 1977), *appeal dismissed*, 439 U.S. 803, 99 S.Ct. 57, 58 L.Ed.2d 95 (1978). This standard of review is applicable to cases in which the appellant challenges the construction of law or legal standard applied to it by an administrative agency. *Scientology, supra.* It allows the reviewing court to resolve factual issues where it has been successfully urged by appellant that the legal standard applied by the agency was incorrect. *Bergman v. Board of Trustees of Firemen's Retirement System*, 425 S.W.2d 143, 147 (Mo. 1968); *Guntli v. McLeod*, 646 S.W.2d 899, 901 (Mo.App.1983); *see also, Bank of Crestwood v. Gravois Bank*, 616 S.W.2d 505, 518 (Mo. banc 1981) (Rendlen, J., dissenting).

■ Evangelical's challenge to the construction placed on § 137.100(5) by the Commission invokes this latter standard of review. However, Evangelical is unable to demonstrate either the merits of its construction of the statute or the inadequacy of the Commission's. Therefore, Evangelical's argument may be answered without the need for an independent determination of the facts under § 536.140.3.

■ On the merits of the case, the substance of Evangelical's argument is that in determining the charitable nature of the use to which the subject property was put the Commission improperly focused upon the financial status of the home's residents. Instead, Evangelical suggests that the provision of residential and other services to the elderly, at cost or less, is necessarily a charitable activity. This argument is not supported by the applicable precedents.

■ In *Franciscan Tertiary Province, supra*, this Court overruled a line of cases which applied a distinct standard for determining charitable tax-exempt status to homes for the elderly, separate from that applied to all other activities and services.[2] In doing so, a construction of § 137.100(5) was rejected that would have required a

home for the aged qualifying for tax exemption to show that its services were provided only to the indigent, the infirm or those who would otherwise be burdens on society or the government. *Franciscan*, 566 S.W.2d at 218. Instead, this Court reversed the Commission's decision denying exemption, applying the test for charitable use established in *Salvation Army v. Hoehn*, 354 Mo. 107, 188 S.W.2d 826 (banc 1945). *Id.* at 224. Under that test, the dominant use of the property must be "for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government." *Salvation Army*, 188 S.W.2d at 830 (*quoting In re Rahn's Estate*, 316 Mo. 492, 291 S.W. 120, 128 (1926)).

The term "dominant use" as used in *Franciscan*, 566 S.W.2d at 224, comes from *Salvation Army*. This concept contrasts with the first of two other requirements for charitable tax exemption suggested by *Franciscan*, that is, that the property be "dedicated unconditionally to the charitable activity." *Id.* This requirement, actually only hinted at in *Franciscan*, refers to the statutory mandate of § 137.100(5) that the subject property be "used exclusively" for charitable purposes. *Sunday School Board of the Southern Baptist Convention v. Mitchell*, 658 S.W.2d 1, 5 (Mo. banc 1983); *see Barnes Hospital v. Leggett*, 589 S.W.2d 241, 244 (Mo. banc 1979) (adopting a partial exemption for portions of buildings or tracts used for charitable purposes). Exclusivity of use is not questioned in this case.

The second of these requirements is that the property be "owned and operated on a not-for-profit basis. It must be dedicated unconditionally to the charitable activity in

---

**2.** Those cases include *Westminster Gerontology Foundation, Inc. v. State Tax Comm'n*, 522 S.W.2d 754 (Mo.1975); *Missouri United Methodist Retirement Homes v. State Tax Comm'n*, 522 S.W.2d 745 (Mo.1975); *Paraclete Manor of Kansas City v. State Tax Comm'n*, 447 S.W.2d 311 (Mo.1969); and *Defenders' Townhouse, Inc. v. Kansas City*, 441 S.W.2d 365 (Mo.1969).

such a way that there will be no profit, presently or prospectively, to individuals or corporations." *Franciscan* at 224; *Sunday School* at 5. The Commission had some concern in this instance that the project generated profit to a hidden principal (even though it operated at net cost), the entity which conceived, developed and managed the home. However, the Commission declined to base its decision on profit considerations, choosing instead the more demonstrable ground of charitable use. By confirmation of the Commission's decision on its chosen rationale, it is unnecessary to determine whether Evangelical satisfied the non-profit requirement.

■ Inherent in the *Salvation Army* standard is the requirement of an "element of direct or indirect benefit to society in addition to and as a result of the benefit conferred on the persons directly served by the humanitarian activity." *Franciscan* at 224. The home considered by the court in *Franciscan* was found to satisfy this measure, in that it provided housing and other services to elderly, low-income people at considerably less than cost. *Id.* at 217, 225.

■ Evangelical hangs its hat on the theory that it is providing a benefit to society by taking care of elderly persons without profit, and that it is thereby engaged in a tax exempt humanitarian activity. However, that result does not necessarily obtain in the situation, as here, in which a retirement home excludes low-income elderly people from its services. The unified definition of "charity" expressed in *Salvation Army*, and applied to retirement residences in *Franciscan*, contains an element of applicability of benefit to "an indefinite number of persons," *Salvation Army* at 830, which is otherwise characterized as a requirement that the humanitarian service be "public." *Id.; In re Rahn's Estate*, 291 S.W. at 128. This does not mean that an activity or service, to be charitable, must be available to all, for "it may be for the blind, the mute, those suffering under special diseases, for the aged, for infants, ... for different callings or trades by which humanity earns its bread, ... as long as the classification is determined by some distinction which involuntarily affects or may affect any of the whole people." *Salvation Army*, 188 S.W.2d at 830.

■ It is undisputed that the restriction of charity to the aged alone is consistent with its public nature. It may also be restricted to the more needful of this group, as was done in *Franciscan*. However, the public nature of a charity is diminished when it is systematically denied to those who need and can least afford the service.

■ This precept is aptly demonstrated in cases pertaining to hospitals, an analogous charity, which state: "[P]roviding of hospital facilities for the sick in a non-profit manner rises to a charitable purpose tax-exempt status if the same is available to both rich and poor." *Jackson County v. State Tax Commission*, 521 S.W.2d 378, 383 (Mo. banc 1975); *accord, Menorah Medical Center v. Health and Educational Facilities Auth.*, 584 S.W.2d 73, 82 (Mo. banc 1979).

This is not to say that a hospital may not accept payment for its services from those able to pay. However, "[a] hospital cannot ..., without losing its character as a public charitable hospital, receive pay patients to such an extent as will exhaust its accommodations and prevent its receiving and extending hospital service to the usual and ordinary number of indigent patients applying for admission ...." *Community Memorial Hospital v. City of Moberly*, 422 S.W.2d 290, 295 (Mo.1967) (*quoting* former 15 Am.Jur.2d *Charities* § 148 (1964), now 15 Am.Jur.2d *Charities* § 183 (1976).

The rule is similar for retirement homes and other residences for the aged although some disagreement in authority exists. A prime example is *Methodist Old Peoples Home v. Korzen*, 39 Ill.2d 149, 233 N.E.2d 537 (1968). The facts in *Korzen* are essentially the same as those here, and admittance was keyed to some substantial financial endowment qualification and monthly

payment. Charitable tax exemption was denied, the court stating that a charity must be for the benefit of an indefinite number of persons, must be available to all who need and apply for it and must "not appear to place obstacles of any character in the way of those who need and would avail themselves of the charitable benefits it dispenses." *Id.*, 233 N.E.2d at 541–42. A like result is attained in *Michigan Baptist Homes & Dev. Co. v. City of Ann Arbor*, 396 Mich. 660, 242 N.W.2d 749 (1976), holding that "charity or benevolence benefit the general public without restriction." *Id.*, 242 N.W.2d at 753. The holdings are similar in *Madonna Towers v. Commissioner of Taxation*, 283 Minn. 111, 167 N.W.2d 712 (1969), and *Friendsview Manor v. State Tax Commission*, 247 Or. 94, 420 P.2d 77 (banc 1966).[3]

Contrary authorities exist. Notable among these are the California decisions, culminating in *Fifield Manor v. County of Los Angeles*, 188 Cal.App.2d 1, 10 Cal.Rptr. 242 (1961), which holds that "a home for the aged which caters to wealthy persons and furnishes them those services and care needed by the old and infirm, rich or poor, does not cease to be a charitable institution so long as its charges do not yield more than actual cost of operation." *Id.*, 10 Cal. Rptr. at 254.

Much the same is *Matter of Tax Appeal of Central Union Church-Arcadia Retirement Residence*, 63 Haw. 199, 624 P.2d 1346 (1981), holding that the provision of lifetime retirement services, at cost, to the elderly is an exempt charitable use, even if the operating expenses are "primarily derived from fees charged residents," *id.*, 624 P.2d at 1348, and "even though the efforts may be focused on the needs of the middle class elderly." *Id.* at 1350. The court appears to have been partly persuaded, however, by the fact that the home was operated by a church, thus assuring "the absence of a profit motive and the presence of an altruistic goal." *Id.* at 1352.

However, the principle forwarded by *Fifield Manor* is a significant departure from the decree by the California Supreme Court in *Fredericka Home for the Aged v. San Diego County*, 35 Cal.2d 789, 221 P.2d 68 (banc 1950), a case congruent with *Franciscan*. In *Fredericka*, the court rejected a *per se* rule that would have denied exemption to homes for the aged which charged fees of its residents. Instead, it upheld the exemption, stating that "the concept of charity is not confined to the relief of the needy and destitute." *Id.* at 70. Persuasive in *Fredericka* was that the home ministered to its elderly residents "at a charge which, although appreciable, is within the reach of persons in modest circumstances and is no greater than that which is required to augment the substantial amount which [the home] is able to contribute to the accomplishment of its purposes." *Id.*, at 72; *accord Bozeman Deaconess Foundation v. Ford*, 151 Mont. 143, 439 P.2d 915 (1968). The opinion illustrates the limits to be applied to tax exempt status for retirement homes:

[T]here can be no doubt that arrangements for such life care contracts fill a social purpose as well as a need of the applicants for admission. Approaching those years when the physical and mental faculties normally decline over an indefinite period of time and being faced with the prospect of expending increased but indeterminable amounts for care during that period, the applicants, by means of such life care contracts, avoid the need of living in penury occasioned by the haunting fear that they will exhaust their meager resources and become public charges. Accordingly, it is our conclusion that where, as here, the payments made by the elderly residents are within the reach of persons of limited means, where such payments are not commensurate with the benefits derived, where there is no element of private gain, and where all the income of the institution—including that received from residents and the substantial portion re-

---

**3.** For a survey of the application of the charitable exemption to homes for the aged, *see* cases collected in Annot., 37 A.L.R.3d 565 (1971) and Annot., 37 A.L.R.3d 1191 (1971).

ceived from gifts and other sources—is devoted exclusively to affording a reasonable standard of care to such elderly persons for the balance of their lives, the concept of charity in its ordinary sense, as well as under a strict but reasonable construction of the welfare exemption law, is met.

*Fredericka,* 221 P.2d at 72.

A similar circumstance to *Fredericka* is found in *Memorial Hospital v. Sparks,* 9 Ariz.App. 478, 453 P.2d 989 (1969), involving $65 to $95 monthly fees. The ability to pay these fees was made a condition for admission, but the home's policy to subsidize those unable to pay after having been admitted and the fact that the facility provided an operation "structured to a class of people who under normal conditions would not be able to receive the type of accommodations provided" contributed to the exemption approval. *Id.,* 453 P.2d at 993.

 In the situation confronting this Court, we need be chary of attempting to impose financial standards regarding tax exemptions on those institutions providing a home to aged people. The self-sustaining charity should not be placed in the position of choosing between a self-destructing influx of destitute elderly and tax exempt status. It is manifest from *Franciscan* that charity is not limited to the destitute. *Id.,* at 225–26. Nor is it impermissible under *Franciscan* for the project to operate in the black on a regular basis so long as charity is the dominent objective. *Id.* at 224.

 The essence of the charitable nature of homes for the aged is that they accommodate the ability to pay of the less financially fortunate elderly.[4] It is in this manner that the home in *Franciscan* achieved a public benefit. This is not to say that a home for the aged, in order to be charitable, may not require reimbursement from those financially able to fend for themselves. Nor must the home be prevented from subsidizing those services pro-

vided free or at reduced cost by charging those able to pay at a price above cost, as long as it does not generate "private or corporate profit," § 137.100(5), *supra.* However, the operation of a charitable home for the aged must take into account the ability to pay of the entire spectrum of the aged.

Obviously, there are a variety of methods available for achieving this end. For example, it was achieved in *Franciscan. Community Memorial,* although a hospital, reached the purpose by providing services free of charge to the "usual and ordinary number of indigent." The Tax Commission recognized the requirement of accommodating the impecunious when it found that the financial requirements of Evangelical alone "severely limited meaningful access to [Evangelical's] facilities by the great majority of the elderly."

 So it comes down to this: whether the Commission's decision, under the appropriate standard, and giving full consideration to *Franciscan,* is supported by competent and substantial evidence upon the whole record.

Evangelical's operation fails to comport with the general rubric that a charitable home for the aged is required to accommodate the ability to pay of the less prosperous elderly. Evangelical directs attention to the Commission's finding that it operated on a cost (non-profit) basis as an indication that the services were offered at less than the market rate, thereby allowing the residents to conserve their assets and reduce the likelihood that they will ever become public charges—a worthy service under *Franciscan* or any other standard. An expansive construction of this argument is that the reduction from market price amounted to an accommodation of the residents' ability to pay. Nevertheless, the evidence fully supports the conclusion, fostered by Evangelical, that it provided relatively elaborate facilities and services to those who were not only able to pay for them, albeit at cost, but by all measures

---

**4.** This end, of course, may not be achieved simply by offering low-grade facilities to the less

affluent at a cost commensurate with market price. *See Fredericka Home, supra.*

stood ready to pay for them indefinitely. This is no accommodation to the poor or financially distressed but is at most an accommodation of the more prosperous. As such, it cannot satisfy the test of *Franciscan* of providing service to both rich and poor. The Commission correctly concluded that the home's services were effectively denied to a large percentage of the elderly on the basis of finances. Money—and a substantial sum of it—is the qualifying factor for admittance into the home. *A fortiori*, the Commission's decision rests on competent and substantial evidence.

■ Evangelical's final argument, regarding the application of appeal to its 1978 tax assessment is without consequence, for even if we assume that the proper subject of the Commission's decision was the 1978 assessment, the record in this case supports denial of the exemption for that year.

The judgment of the circuit court is affirmed.

RENDLEN, C.J., HIGGINS and BILLINGS, JJ., and BARRETT, Senior Judge, concur.

WELLIVER and DONNELLY, JJ., dissent in separate opinions filed.

BLACKMAR, J., not sitting.

WELLIVER, Judge, dissenting.

I respectfully dissent. The principal opinion demonstrates little understanding of the growing social problem of caring for the aged and of the success of modern life-care facilities in dealing with the problem. Those knowledgeable in the field of geriatrics are painfully aware that neither government alone nor government and private enterprise can build facilities rapidly enough to care for the ever growing population of the elderly. In my opinion, if a life-care facility meets the legal requirements of a not-for-profit organization, this should be the primary consideration for permitting tax exemption. If on the other hand, the not-for-profit corporation proves to be but a sham cover for funneling prof-

its into the hands of others, the exemption from taxation properly should be denied. The more care provided for the aged by private enterprise, the less care government need provide.

The principal opinion represents a substantial retreat from the holding of *Franciscan Tertiary Province of Mo., Inc. v. State Tax Commission*, 566 S.W.2d 213 (Mo. banc 1978), that indigency is no longer the principal test for exemption from taxation.

DONNELLY, Judge, dissenting.

In *Salvation Army v. Hoehn*, 354 Mo. 107, 114, 188 S.W.2d 826, 830 (1945), this Court disavowed prior decisions which confined "the concept of charity solely to the relief of the destitute * * *." This Court embraced a concept which would include "all humanitarian activities, * * * rendered at cost or less, which are intended to improve the physical, mental and moral condition of the recipients and make it less likely that they will become burdens on society and make it more likely that they will become useful citizens."

In *Franciscan Tertiary Province of Missouri, Inc. v. State Tax Commission*, 566 S.W.2d 213 (Mo. banc 1978), this Court held that in order for property to be exempt from taxation under § 137.100: (1) it must be actually and regularly used for purposes purely charitable as "charity" is defined in *Salvation Army v. Hoehn*, 354 Mo. 107, 114, 115, 188 S.W.2d 826, 830 (1945); (2) it must be owned and operated on a not-for-profit basis; and (3) the dominant use of the property must be for the benefit of an indefinite number of people and must directly or indirectly benefit society generally.

In my view, the majority errs when it adds a fourth requirement to the *Franciscan* test: that the property "accommodate the ability to pay of the less financially fortunate elderly."

I respectfully dissent.