**BETHESDA BARCLAY HOUSE, Appellant,**

v.

**A. CIARLEGLIO, Chairman St. Louis County Board of Equalization and St. Louis County Board of Equalization, et al., Respondents,**

and

**City of Clayton and Clayton School District, Intervenors.**

No. ED 79264.

Missouri Court of Appeals, Eastern District.

Aug. 27, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 22, 2002.

Application for Transfer Denied Nov. 26, 2002.

Thomas M. Blumenthal, Paule, Camazine & Blumenthal, P.C., St. Louis, MO, for appellant.

Patricia Redington, County Counselor, Edward Corrigan Associate County Counselor, Clayton, MO, for respondents.

Lisa S. Leary, Suelthaus & Walsh, P.C., Clayton, MO, for intervenors.

GARY M. GAERTNER, SR., Presiding Judge.

Appellant, Bethesda Barclay House ("Barclay House"), appeals from the judgment of the Circuit Court of St. Louis County, denying its petition which sought a declaration that Barclay House's real estate and personal property located at South Brentwood Boulevard in Clayton, Missouri ("the property"), is tax exempt pursuant to Article X, section 6 of the Missouri Constitution and section 137.100, RSMo 1994[1] and requesting a refund of the ad valorem taxes paid under protest for the years 1997, 1998 and 1999.[2] We affirm.

The standard of review for a court-tried case involving tax exemption is pursuant to *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo.banc 1976). *Two Pershing Square, L.P. v. Boley,* 981 S.W.2d 635, 639 (Mo.App. W.D.1998). The trial court's judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy,* 536 S.W.2d at 32. The reviewing court must accept all evidence and inferences favorable to the trial court's judgment and disregard all evidence to the contrary. *Twin Bridges Electric, Inc. v. Collins,* 823 S.W.2d 14, 16 (Mo.App. E.D. 1991). The following facts are based upon the findings, after testimony and evidence,

---

1. All statutory citations are to RSMo 1994, unless otherwise noted.

2. Barclay House paid $82,872.66 and $1,389.56 for the real and personal property taxes, respectively in 1997, $83,616.25 and $1,209.06, for the real and personal property taxes, respectively in 1998, and $87,296.87 and $970.08, for the real and personal property taxes, respectively in 1999.

of the trial court, subsequent to conducting a trial de novo which was requested by Barclay House following the decision of the St. Louis County Board of Equalization ("the board").

Barclay House is a Missouri not-for-profit corporation and a controlled subsidiary of Bethesda Health Group of St. Louis, Inc. ("Bethesda"). Bethesda is a not-for-profit corporation. Bethesda serves as the parent organization for subsidiaries engaged in various health care activities, including the operation of nursing homes and retirement facilities, in the St. Louis metropolitan area.

The property is a 16–story retirement facility restricted to persons sixty-five years of age and older. In brochures and advertisements Barclay House is described as a "premier retirement facility" featuring such "fine amenities" as cable television, an exercise room, a library, a door attendant, weekly maid service and an outdoor pool. Barclay House is not licensed to provide health care to its tenants. Barclay House purchased the property in 1995 for $6.5 million and subsequently spent $7.5 million in renovations and improvements.

Barclay House paid for the property and part of its renovations with $12 million in tax exempt bonds issued to Barclay House by the Missouri Health and Educational Facilities Authority ("MoHEFA"), pursuant to Chapter 360. The bond purchase was secured by a $10 million promissory note to Bethesda and Mercantile Bank. That promissory note was in turn secured by loan of approximately $10.4 million from a related not-for-profit entity, Bethesda Health Group Foundation ("Bethesda Foundation").

As a condition of residency with Barclay House, tenants must enter into a residency agreement, which includes paying an entrance fee in addition to monthly rent. At the time of trial, monthly rent at Barclay House ranged from $849 to $1,591 and entrance fees ranged from $40,000 to $395,000. Barclay House invests the entrance fees paid by tenants.[3]

Three forms of residency agreements exist at Barclay House, identified as Plan A, Plan B, and Plan C. The evidence did not indicate that Plan B was used. Plan A provides that the entrance fee is refundable if the residency terminates within the first two years. Plan C provides that upon termination of the agreement, Barclay House retains six percent of the entrance fee and the remaining ninety-four percent is refunded to the tenant. At the time of trial, most tenants at Barclay House had chosen to enter Plan C.

Barclay House has a corporate resolution which claims it can waive, in whole or in part, charges to tenants who are without sufficient financial resources. Each residency agreement signed by the tenants provides that the monthly rent may be increased at any time at the sole discretion of Barclay House upon thirty days notice. The residency agreement further provides that Barclay House may terminate the agreement at any time if the tenant fails to pay monthly rent when due and has the right to file suit against the tenant to recover possession of the apartment and reimbursement of all amounts due, including attorney's fees.

Since 1995, Barclay House has offered financial assistance to eight prospective tenants who specifically requested assistance or questioned their ability to afford Barclay House. In those cases, Barclay

---

**3.** John Rowe, CEO of Barclay House, testified that the entrance fees are "free money" to Barclay House.

House offered to reduce or eliminate the entrance fee and reduce monthly rent. In turn, the entrance fees became non-refundable, and in one case, partially refundable within two years. Three of the eight prospective tenants were not admitted because they refused or were unable to pay the reduced fees required by Barclay House. Five prospective tenants accepted Barclay House's offers. The fee reductions account for less than one percent of Barclay House's revenues.

Barclay House's financial statements for the years at issue, 1997, 1998 and 1999, reflect operating losses. At trial, Barclay House's Chief Financial officer testified that Barclay House chose to pre-pay $6.7 million toward the loan due to Bethesda Foundation. Specifically, Barclay House repaid $9.4 million to Bethesda Foundation when only required to pay $2.7 million during that period. Barclay House's reported losses during that period were approximately $2.8 million.

Over Barclay House's objections, expert witness Larry Pevnick ("Pevnick"), a certified public accountant, testified regarding the audited financial statements of Barclay House and the economic impact of the discounted fees on the overall financial status of the company. Pevnick performed a cash flow analysis and compared the revenue that Barclay House received from the tenants that had reduced fees with the expenses incurred by Barclay House as a result of their residency. Pevnick concluded that Barclay House received an overall positive cash flow from these tenants.

Over Barclay House's objections, Ruth Sansone ("Sansone"), the director of development for Brookview Group,[4] testified that there are several for-profit retirement facilities in the vicinity of Barclay House

that offer comparable services at comparable fees. One of the facilities, the Brentmoor, is a competitor of Barclay House.

Over Barclay House's objection, the court allowed into evidence, summaries of applications submitted by prospective tenants, which included the applicant's financial information required by Barclay House. Of the eighty-two tenants who applied for admission to the property, fifty-nine percent declared their assets to be in excess of $500,000, and seventy-seven percent declared total net assets in excess of $200,000. Thirty-four percent declared their annual income to be in excess of $50,000 and sixty-seven percent declared their annual income as $30,000 or more.

On June 3, 1997, Barclay House filed its petition with the board. On December 17, 1997, the board issued its final decision denying Barclay House's application for tax exempt status and finding that the use of the property did not meet the qualifications for exemption from real and personal property taxes. Barclay House petitioned for trial de novo. The case went to trial on June 19, 2000. On January 2, 2001, the trial court entered its judgment, denying all relief sought by Barclay House. Intervenors, City of Clayton and Clayton School District ("Intervenors"), filed a Motion to Amend the Judgment pursuant to Missouri Supreme Court Rules 75.01 and 78.07(c) on January 30, 2001. Judgment was amended on February 14, 2001, to direct the Collector of Revenue to release the impounded taxes. Barclay House appeals.

 In considering Barclay House's claim of tax exemption this Court is mindful of several well-established principles. Taxation of property is the rule and tax exemption is the exception. *S.S. Bd. of S.*

4. Brookview Group is the developer and manager of several for-profit retirement communities in the St. Louis area.

*Baptist Convention v. Mitchell,* 658 S.W.2d 1, 4 (Mo.banc 1983). Statutes that grant tax exemption should be strictly, but reasonably construed against the party claiming the exemption. *Id.* Claims for exemption are not favored in the law. *Id.* The property owner bears a substantial burden to prove that the property falls within the exempted class. *Id.*

■ In its first point on appeal, Barclay House argues that the trial court erred in holding that the property is not entitled to tax exemption for the tax years 1997, 1998 and 1999, and for all subsequent tax years and in failing to refund the taxes paid under protest. Barclay House alleges that the trial court is preempted from making such a finding because MoHEFA, in issuing a $12 million bond pursuant to Chapter 360, made a binding determination authorized by the legislature that the property is exempt from all taxation in Missouri. We disagree.

Section 360.055 provides the following:

The authority is authorized and empowered directly, or by or through a participating health institution or participating educational institution, as the case may be, acting as an agent of the authority, to acquire by purchase, lease, gift, devise, or otherwise such lands, structures, real or personal property, rights-of-way, franchises, easements, and other interests in lands, including lands lying under water and riparian rights which are located within or without the state, as the authority may deem necessary or convenient for the construction or acquisition or operation of any facility or facilities, but only upon such terms as may be considered by the authority to be reasonable, and to take title thereto in the name of the authority or in the name of the participating health institution or the participating ed-

ucational institution, as the case may be, as the agent of the authority.

Section 360.085 provides:

The authority is hereby declared to be performing a public function in behalf of the state and to be a public instrumentality of the state. Accordingly, the income of the authority and all properties at any time owned by the authority shall be exempt from all taxation in the state of Missouri.

Barclay House argues that by qualifying for the $12 million bond from MoHEFA, the property is a property of the authority and thus, exempt from all taxation in Missouri. Although, "properties ... owned by the authority" is not defined in the statute, Barclay House claims that property of the authority is "defined as property that the Authority 'may deem necessary or convenient for the construction or acquisition or operation of any facility or facilities, ....' to which a health institution receiving money pursuant to a grant from the Authority takes title. Section 360.055 RSMo (1994)."

Neither section 360.055 nor any other statutory section defines "properties ... owned by the authority." Section 360.055 authorizes and empowers the authority directly or through a participating health institution, acting as the agent of the authority, to acquire real and personal property and to take title thereto in the name of the authority or in the name of the participating health institution as the agent of the authority. No statutory provision requires the authority to take title to real property for which it provides financing or issues bonds.

A review of the record demonstrates that the property in this case is not a property "owned by" authority and that Barclay House did not acquire it as an agent of the authority. The Official Statement of the Health Facilities Reve-

nue Bonds issued by MoHEFA on behalf of Barclay House acknowledges that Barclay House is the owner of the property. It also acknowledges that the bonds were issued to provide funds to allow the authority to make a loan to Barclay House in acquiring and renovating the property. In addition, Barclay House admitted in its pleadings that it owns the property and this fact has never been disputed. Furthermore, there is no evidence in the record to show that MoHEFA sought or acquired any ownership interest in the property. Because the property is a property owned by Barclay House and not by the authority, the property is not exempted from ad valorem taxation in Missouri pursuant to section 360.085. Point denied.

■ Next, in the interest of continuity, we review Barclay House's third point on appeal. Barclay House argues the trial court erred in admitting and relying on the financial information of the residential applicants, and the testimony of Larry A. Pevnick and Ruth Sansone. Barclay House claims that the testimony is irrelevant and immaterial in that the Supreme Court has explicitly declined to apply such mathematical tests to determine whether an entity's activities are charitable, or whether an entity is tax-exempt. Barclay House alleges that not only did the trial court err in admitting the evidence, it gave them great weight in its judgment. Citing to *Affiliated Medical Transport, Inc. v. State Tax Com'n of Missouri*, 755 S.W.2d 646, 650 (Mo.App. E.D.1988) and *S.S. Bd. of S. Baptist Convention*, 658 S.W.2d at 4–5, Barclay House argues that these cases emphasize that economic status is not a criterion in determining charitable purposes, thus, if economic status is not a criterion, the above evidence admitted should have been excluded by the trial court. We disagree.

■ Our review of error alleged in the admission or exclusion of evidence is limited to an abuse of discretion standard. *Caples v. Earthgrains Co.*, 43 S.W.3d 444, 452 (Mo.App. E.D.2001). "The trial court abuses its discretion when the ruling is clearly against the logic of the circumstances before it and is so unreasonable and arbitrary as to shock the sense of justice and indicates a lack of judicial consideration." *Whitworth v. Jones*, 41 S.W.3d 625, 627 (Mo.App. E.D.2001). The trial court's judgment will be affirmed unless we find the error committed materially affected the merits of the action. *Id.* The trial court's decision to admit or to exclude evidence is given substantial deference on appeal. *Caples*, 43 S.W.3d at 452.

While *Affiliated Medical Transport*, and *Sunday School Bd. Of Southern Baptist Convention*, caution against emphasizing economic status as a criterion; they do not prohibit the consideration of the above evidence. In *Affiliated Medical Transport*, this Court stated:

The Commission's attempt to append an additional requirement to the *Franciscan* test in its decision by requiring Affiliated to serve primarily the indigent has been rejected by the Missouri Supreme Court in *Franciscan*. The Court explicitly declined to make the economic status of a charity's beneficiaries a criterion for determining whether to grant the charity tax-exempt status and supported this decision by citing the recognized proposition that charity is not limited solely to the relief of the destitute. *Id.* at 650.

■ These cases and other similar cases that caution against adding economic status as a criterion do not prohibit the trial court from considering financial information in applying the three elements of *Franciscan*. Consideration of the materiality of the charity being given is a legiti-

mate inquiry. *See, e.g., Affiliated Medical Transport, Inc.,* 755 S.W.2d at 652–653. Here, the trial court admitted Exhibits MMMM and NNNN, which are summaries of applications, submitted by prospective tenants and included the financial information required by Barclay House. The trial court also allowed the testimony of Pevnick. Pevnick testified to his analysis of the audited financial statements of Barclay House and the economic impact of the discounted fees on the overall financial status of the company. Furthermore, the trial court allowed Sansone to testify that there are several for-profit retirement facilities in the vicinity of Barclay House that offer comparable services at comparable fees. The above evidence goes to the materiality of the charity given by Barclay House. The evidence is relevant and thus, is admissible. Therefore, Barclay House has not demonstrated that the decision of the trial court is so unreasonable and arbitrary as to shock the sense of justice.

In its second point on appeal, and the final point addressed herein, Barclay House argues that the trial court misapplied the case law, and made findings against the weight of the evidence, when it held that the property is not entitled to tax exemption and failed to refund the taxes paid under protest. Barclay House also claims that the trial court relied on inadmissible criteria in reaching its holding. We disagree.

■■■■ Article X section 6 of the Missouri Constitution and section 137.100(5), allows exemption from ad valorem taxes for property used exclusively for charitable purposes. The Missouri Supreme Court's decision in *Franciscan Tertiary Prov. v. State Tax Com'n,* 566 S.W.2d 213 (Mo.banc 1978) identified the factors which determine whether a property should be tax exempt as a charity. The three-prong test adopted in *Franciscan* and later clarified

in *Evangelical Ret. Homes v. State Tax Com'n,* 669 S.W.2d 548 (Mo.banc 1984), requires that the property satisfy three elements: 1) the property must be owned and operated on a not-for-profit basis; 2) the property must be dedicated unconditionally to a charitable activity; and 3) use of the property must benefit an indefinite number of persons. *Id.* at 553–54.

■■■■ The first prong requires the property to be owned and operated on a not-for-profit basis. *Franciscan,* 566 S.W.2d at 224. The property must be owned and operated on a not-for-profit basis so that there can be no profit presently or prospectively, to individuals or corporations. *Id.* This does not mean that the property must always operate on a deficit basis. *Id.* However, any gain must be incidental to the accomplishment of the charitable objective and must not be a primary goal of the project. *Id.* Further, any such gain must be devoted to the charitable objective. *Id.* In addition, a tax exemption will not be granted to property which houses a business operated for gaining profit, even if the profit is turned over to a parent organization to be used for a charitable purpose. *S.S. Bd. of S. Baptist Convention,* 658 S.W.2d at 6. "There must be a more significant nexus between profits earned through use of the property for which an exemption is sought and the use that is made of those profits." *Id.*

■■■■ Here, Barclay House argues the following:

The trial court found that Barclay House is owned by a Missouri nonprofit corporation incorporated under Chapter 355 of the Missouri Statutes, the General Missouri Nonprofit Corporation Law. The corporation has received tax exempt status from the Missouri Department of Revenue and the Internal Revenue Service. Bethesda has also received tax

exempt bonds from MoHEFA, which makes the property itself tax exempt. Barclay House is therefore owned on a not-for-profit basis, and is operated in such a way as to be self-sustaining and to not generate any private "profit" which benefits any person or organization.

Undoubtedly, the property is owned by Barclay House on a not-for-profit basis. However, Barclay House has failed to demonstrate how the property is operated on a not-for-profit basis. Barclay House's financial statements for 1997, 1998 and 1999 do show a deficit of approximately $2.7 million. Nevertheless, it is worth pointing out that at the same period, Barclay House had enough money to prepay approximately $6.7 million toward a promissory note to an affiliated company, Bethesda Foundation, several years before payments were due. Furthermore, John Rowe ("Rowe") Barclay House's chief executive officer testified that in the future, Barclay House's revenues are expected to exceed its expenses and that those revenues will be used to help fund Bethesda services in other areas. Thus, the profits from Barclay House will not be devoted to a charitable objective. Moreover, even in the five specific cases in which Barclay House reduced its fees, the record reveals that the income produced by these five residents was more than the expenses incurred by Barclay House. While the record supports that the property is owned on a not-for-profit basis, the record does not support Barclay House's contention that it operated the property on a not-for-profit basis.

■■■■ The second prong requires that the property be dedicated unconditionally to the charitable activity. *S.S. Bd. of S. Baptist Convention*, 658 S.W.2d at 5. "This requirement stems from the statutory mandate that the property be 'used

exclusively' for charitable purposes, section 137.100(5), within the *Salvation Army* definition of charity." *Id.* (citation omitted). In *Salvation Army v. Hoehn*, 354 Mo. 107, 188 S.W.2d 826, 830 (1945), the Supreme Court defined charity as:

> ... a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government. *Id.*

The phrase "used exclusively" refers to the primary and inherent use as opposed to a mere secondary and incidental use. *Id.* A charity must be available to all who need it and must not appear to place obstacles of any character in the way of those who need and would take advantage of the charitable benefits. *Evangelical*, 669 S.W.2d at 555. Providing retirement homes for the elderly in a non-profit manner rises to a charitable purpose if the home is available to both rich and poor. *Cape Retirement Community v. Kuehle*, 798 S.W.2d 201, 203 (Mo.App. E.D.1990). "The essence of the charitable nature of homes for the aged is that they accommodate the ability to pay of the less financially fortunate elderly." *Evangelical*, 669 S.W.2d at 556.

■■■ Here, the evidence does not support Barclay House's contention that the property is devoted exclusively to a charitable purpose. At the time of trial, monthly rent at Barclay House ranged from $849 to $1,591 and entrance fees ranged from $40,000 to $395,000. The testimony of Michelle Glass ("Glass"), Barclay House's manager, made clear that prospective tenants are not encouraged to apply for finan-

cial aid and in fact were not even told of possible aid unless they specifically inquired. Discounts were given to five tenants since 1995. Under the financial assistance plans, the discounted entrance fees offered were still substantial sums of money ranging from $20,000 to $65,000. In addition, the entrance fees were non-refundable in most cases. Discounted monthly rents offered ranged from $475 per month to $950 per month under the discount plans. In the two cases where the entrance fees were waived, monthly rent was charged at $849 and $950, which resulted in the tenant's rent exceeding their monthly income. As a result of the still substantial financial requirements, many prospective tenants declined to accept Barclay House's offer of financial assistance. Additionally, all tenants are required to sign a residency agreement which provides that the monthly rent may be increased at any time at the sole discretion of Barclay House upon thirty days notice, and that at any time if the tenant fails to pay the monthly rent when due, it shall have the right to file suit against the tenant to recover possession of the apartment and reimbursement of all amounts due, including attorney's fees. Furthermore, Barclay House was marketed and advertised as a "premier retirement facility" with extravagant and luxurious amenities and not as a facility with a charitable purpose.

The evidence clearly demonstrates that obstacles are placed in the path of less fortunate individuals seeking residency at the property. Barclay House has failed to prove that its primary and inherent use of the property is for purposes purely charitable.

■ The third prong requires that the primary use of the property benefit an indefinite number of people. *Franciscan*, 566 S.W.2d at 224. This entails a direct or indirect benefit to society in addition to and as a result of the benefit to the persons directly served. *Id.*

■ Here, the evidence does not support Barclay House's contention that the property's use benefits an indefinite number of people or society in general. The record indicates that the tenants of Barclay House are in no danger of becoming public charges. But for Barclay House's housing, the tenants would have the means and support necessary to secure housing in other facilities comparable to Barclay House. This is in marked contrast to the tenants in *Franciscan* whose assets were so limited that without the provision of low cost housing at Chariton Apartments they could be forced into public housing or subsidized housing. *Id.* at 225. There is no evidence that society as a whole has derived any benefit as a result of the five cases where discounts were given from Barclay House. In fact, the discounts in these five cases accounted for less than one percent of Barclay House's total revenues for 1997, 1998, and 1999. In *Evangelical*, the Supreme Court found that the facility's "services were effectively denied to a large percentage of the elderly on the basis of finances." *Evangelical*, 669 S.W.2d at 557. Like in our case, the waiver or reduction of fees in *Evangelical* was minimal. *Id.* at 552 (finding that the waiver of fees never aggregated more than one percent of the facility's gross monthly income). Thus, Barclay House failed to show the use of the property benefits an indefinite number of the elderly.

Barclay House failed to prove that it operated on a not-for-profit basis. It also failed to prove that the property is dedicated unconditionally to the charitable activity. Further, Barclay House failed to prove that the property's use benefits an indefinite number of people or society in general. Because Barclay House did not

satisfy these three prongs, we conclude that it is ineligible for exemption from ad valorem taxes for the property. Point denied.

Based on the foregoing, we affirm the judgment of the trial court.

PAUL J. SIMON, J. and CLIFFORD H. AHRENS, J. concur.